**Alfred BLASBAND**

v.

**Steven M. RALES; Mitchell P. Rales; John Doe 1–10; Danaher Corporation,**

**Alfred Blasband, derivatively on behalf of Danaher Corporation, Appellant.**

No. 91–3633.

United States Court of Appeals, Third Circuit.

Argued April 7, 1992.

Decided July 31, 1992.

Stephen A. Whinston (argued), Arthur Stock, Berger & Montague, P.C., Philadelphia, Pa., Mark Minuti, Saul, Ewing, Remick & Saul, Wilmington, Del., for appellant.

Stephen P. Lamb (argued), Robert A. Glen, Robert E. Zimet, Joseph Guglielmelli, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for appellees Stephen M. Rales and Mitchell P. Rales.

David C. McBride, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for appellee Danaher Corp.

Before GREENBERG and SCIRICA, Circuit Judges, and DEBEVOISE, District Judge *.

* Honorable Dickinson R. Debevoise, United States District Judge for the District of New Jersey, sitting by designation

GREENBERG, Circuit Judge:

## I.

## FACTUAL AND PROCEDURAL HISTORY

Alfred Blasband appeals from a district court order of August 15, 1991, dismissing his complaint pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 23.1 in this shareholder derivative suit. This appeal raises difficult issues regarding shareholder standing and demand futility in derivative actions brought under Delaware law. In view of the procedural posture of the case, we will accept Blasband's allegations in our disposition of the appeal.

Blasband is a former shareholder of Easco Hand Tools, Inc. On September 1, 1988, while Blasband was an Easco shareholder, Easco initiated a public offering of $100 million of 12.875% Senior Subordinated Notes (the "Note Offering"). In the prospectus for the Note Offering, Easco disclosed that the proceeds would be used for repayment of outstanding indebtedness, general corporate purposes, and expansion of Easco's business through internal growth and acquisitions. The prospectus further stated that "[p]ending such uses, the Company will invest the balance of the net proceeds from this offering in government and other marketable securities which are expected to yield a lower rate of return than the rate of interest borne by the Notes."

After the Note Offering was completed, Easco invested at least $61.9 million of the proceeds in high-yield, highly speculative debt securities, commonly known as junk bonds. In its Form 10–K filed with the Securities and Exchange Commission for the year ended December 31, 1988, Easco disclosed these investments as "temporar[y] invest[ments] in marketable securities and cash equivalents." One year later, in its 1989 Annual Report and 10–K, Easco disclosed that it still held these investments

but that "[d]uring 1989, the market for these securities became volatile and some market values declined significantly." Explaining that "[g]reater risk is generally associated with these high-yield securities, for which a thinly traded market exists and for which market quotations are not always available[,]" Easco stated that it had reduced the carrying value of its portfolio by $14 million and that it would probably suffer further losses if the remaining issues were sold. Easco disclosed an additional $1 million loss in its March 31, 1990 Form 10-Q filed with the SEC.

In February 1990, Easco entered into a merger agreement with the nominal defendant Danaher Corporation and Combo Acquisition Corporation, a wholly owned subsidiary of Danaher, providing for Easco shareholders to receive .4175 shares of Danaher common stock for each of their shares of Easco common stock. The merger was consummated in June 1990 with Easco surviving as a wholly owned subsidiary of Danaher. Consequently, Blasband's 1,100 shares of Easco were converted into 458 shares of Danaher.[1]

Prior to the merger, Mitchell P. Rales was Chairman of Easco's board of directors and owned approximately 25% of Easco's common stock. His brother, Steven M. Rales, was a director of Easco and owned 27% of its stock. Mitchell Rales is also President and a director of Danaher, and Steven Rales is Chairman of the board of directors of Danaher. Together the brothers own 44% of Danaher's common stock. Beginning sometime in the mid–1980's, the Rales brothers retained Drexel Burnham Lambert Incorporated to assist in the Rales' corporate acquisition strategy. Through junk bond financing arranged by Drexel, the Rales brothers expanded Danaher by acquiring Western Pacific Corporation and Chicago Pneumatic Corporation. In 1988 the Rales brothers hired Drexel in connection with an ultimately unsuccessful $2.5 billion bid to acquire another company. In addition, Drexel assisted the Rales brothers in acquiring an interest in Easco in 1986 by partially providing the financing.[2] Furthermore, Drexel was selected as the sole underwriter for the Note Offering.

The junk bond investment of the proceeds of the Note Offering did not go unnoticed for, on October 25, 1990, Blasband's counsel sent a letter to the boards of directors of Easco and Danaher setting forth the discrepancy between the proposed use of the proceeds in the prospectus for the Note Offering and Easco's financial statements disclosing the actual investments in junk bonds. The letter requested additional information to explain, *inter alia:* (1) why the junk bond portfolio had lost $14 million in one year; (2) what securities Easco had purchased and sold between September 1, 1988, and December 31, 1989, and at what prices and through which brokerage house; (3) which Easco officers and directors approved or selected the purchases and sales; and (4) why Easco used the proceeds of the Note Offering in a manner contrary to that described in the prospectus. Counsel for Blasband stated that, although much of this information "could be obtained through a formal demand for inspection of the Company's books and records, we believe that it is in our mutual interest to proceed on a less formal basis."

Counsel for Danaher and Easco responded in a letter dated December 17, 1990, that "it would be inappropriate at this time to provide" the requested information. Further, counsel stated that "Easco fully and fairly complied with the requirements of the federal securities laws and regulations in disclosing all material information concerning the Note Offering and the subsequent use of the proceeds of that offering to its shareholders in its public financing." Additionally, counsel stated that compliance with the request "would impose a substantial burden on our clients ... [and] would be time-consuming and highly dis-

---

**1.** According to our calculations Blasband should have received 459 shares.

**2.** According to the complaint the Rales brothers acquired Easco through another company of which they were 65% owners. Blasband acquired his interest in Easco in 1987. The complaint does not explain all the steps in these transactions but they are not important to our disposition of this case.

ruptive of the day-to-day management of the business...."

Unsatisfied with this response, Blasband filed this derivative action in the United States District Court for the District of Delaware on behalf of Danaher on March 25, 1991. The essence of Blasband's claim is that the Rales brothers violated their fiduciary duties owed to Easco by investing proceeds of the Note Offering in highly speculative junk bonds as consideration for their business dealings with Drexel and not for a legitimate corporate purpose. Blasband named the Rales brothers and ten "John Does" who were officers and directors of Easco at the time of the Note Offering as defendants. Danaher was joined as a nominal defendant. Blasband has not specifically identified the John Doe defendants and thus the Rales brothers remain the only actual defendants and we therefore refer to them as the appellees.

Prior to discovery, the appellees moved to dismiss the complaint pursuant to Rules 12(b)(6) and 23.1 on the grounds that Blasband had not made an appropriate demand on the directors of Danaher to take action and did not establish demand excusal.[3] Furthermore, the appellees contended that Blasband lacked standing to bring this action.

The district court granted the appellees' motion. Applying Delaware law, the district court held that demand excusal should be measured with regard to the Danaher board, and that Blasband did not adequately plead that demand would have been futile. Additionally, the court agreed with the appellees that Blasband lacked standing as a result of the merger. Accordingly, on August 15, 1991, the court dismissed the complaint with prejudice. *Blasband on behalf of Danaher Corp. v. Rales,* 772 F.Supp. 850 (D.Del.1991). Blasband filed a timely notice of appeal on September 12, 1991.

We agree with the district court that Blasband has not adequately established

that he is excused from making a proper demand. However we also believe, contrary to the district court, that Blasband does have standing to maintain this derivative action, and we therefore hold that Blasband should be given the opportunity to move to amend the complaint to allege additional facts establishing that a proper demand would have been futile. Accordingly, we will vacate the order of August 15, 1991, and will remand the case for further proceedings.[4]

## II.

### STANDARD OF REVIEW

Blasband argues that our review is plenary to the extent that the district court granted the motion to dismiss pursuant to Rule 12(b)(6). *See Scattergood v. Perelman,* 945 F.2d 618, 621 (3d Cir.1991). The appellees, on the other hand, assert that the district court exercised its discretion in dismissing this action pursuant to Rule 23.1, and accordingly we may reverse only if we find an abuse of discretion. In fact, the district court's order recited that it granted the motion to dismiss under both Rules 12(b)(6) and 23.1. However, the district court's label is not binding on us. Rather, we must look to the course of the proceedings in the district court and the basis for its decision to determine the standard of review. *Melo v. Hafer,* 912 F.2d 628, 633 (3d Cir.1990), *aff'd,* — U.S. —, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Rose v. Bartle,* 871 F.2d 331, 340 (3d Cir.1989).

Rule 23.1 requires the plaintiff in a derivative action to allege that he or she was a shareholder at the time of the challenged transaction, and to set forth "with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ..., and the reasons for the plaintiff's failure to obtain the action or for not making the effort." As we later discuss, the rule does not require a plaintiff to make a demand upon the directors to take action where to do so would be futile.

---

**3.** Blasband admits that he did not make a proper demand and contends only that demand should be excused.

**4.** The district court had subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) and we have jurisdiction under 28 U.S.C. § 1291.

Generally, the district court's determination of demand futility depends upon the facts of each case and is reviewed for abuse of discretion. *Peller v. Southern Co.*, 911 F.2d 1532, 1536 (11th Cir.1990); *Starrels v. First Nat'l Bank*, 870 F.2d 1168, 1170 (7th Cir.1989); *Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 68 n. 10 (D.C.Cir.1988); *Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir.1983). *See also Lewis v. Curtis*, 671 F.2d 779, 783 (3d Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982).

■ However, on this appeal Blasband challenges the legal precepts employed by the district court in making its determination that he did not adequately plead demand futility. We exercise plenary review over a district court's choice and interpretation of legal precepts. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir.1981), *cert. denied*, —— U.S. ——, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992)). We apply this standard regardless of whether the district court is applying federal law or state law. *See Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).[5] Accordingly, while we review both the district court's determination of demand futility and its decision to dismiss the complaint with prejudice under an abuse of discretion standard, *see Lewis v. Curtis*, 671 F.2d at 783, we exercise plenary review over its choice of legal precepts upon which those determinations were based. Furthermore, as we are deciding the standing issue by the application of legal precepts our review on this point is plenary.

## III.

## STANDING

■ Although the district court primarily dismissed Blasband's complaint because of his failure to satisfy the demand requirement, we will first address the issue of standing. The appellees argue that as a result of the merger Blasband lacks standing to bring this derivative action. Blasband counters that he meets the statutory standing requirements and further that he has "successor derivative standing" by virtue of his status as a former Easco shareholder and his current status as a Danaher shareholder.

In general under Delaware law which the parties agree is applicable a plaintiff must have been a shareholder at the time of the challenged transaction to have standing to maintain a shareholder derivative suit. Delaware General Corporation Law § 327, Del.Code Ann. tit. 8, § 327 (1983).[6] The sole purpose of section 327, as stated by Chancellor Seitz, is "to prevent what has been considered an evil, namely, the purchasing of shares in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock." *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 111 (Del.Ch. 1948). In addition to section 327's requirement, the Delaware courts require that the plaintiff remain a shareholder at the time of the filing of the suit and throughout the litigation. *Kramer v. Western Pacific Indus., Inc.*, 546 A.2d 348, 354 (Del.1988);

---

**5.** The appellees attempt to distinguish *Salve Regina* on the ground that the district court did not determine any "uncertain or evolving" issues of state law. But plenary review of a district court's choice and interpretation of state law precepts is appropriate without regard for whether the state law is uncertain or evolving. In *Salve Regina* the Court held that it was inappropriate for the court of appeals to apply a deferential standard of review of a district judge's determination of an unsettled issue of state law in a diversity action where the district judge had extensive experience as a state trial judge. *See also Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 148–49 (3d Cir.1988).

**6.** Section 327 of the Delaware General Corporation Law provides:

In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law.

Del.Code Ann. tit. 8, § 327.

Citations to the General Corporation Law will hereafter appear as "8 *Del.C.*" followed by the section number, or simply as a section number.

*Lewis v. Anderson,* 477 A.2d 1040, 1046 (Del.1984). This requirement ensures that the plaintiff has sufficient incentive to represent adequately the corporation's interests during litigation. *See Portnoy v. Kawecki Berylco Indus., Inc.,* 607 F.2d 765, 767 (7th Cir.1979). Additionally, as with section 327, the continuing ownership requirement is intended to prevent abuses associated with derivative actions. *Lewis v. Anderson,* 477 A.2d at 1046.

■ Where there has been a cash-out merger, it is clear that a former shareholder may not maintain a derivative action, for he or she would no longer have an interest in a subsequent corporate recovery. *See, e.g., Kramer,* 546 A.2d 348. However, where, as here, the plaintiff receives shares of a new corporate entity, the standing issue is less clear, as the plaintiff will have a financial interest in the derivative action. For example, in *Helfand v. Gambee,* 37 Del.Ch. 51, 136 A.2d 558 (Del.Ch.1957), the plaintiff was a shareholder in a corporation required to reorganize and separate certain aspects of its business pursuant to a consent decree resulting from an antitrust action brought by the United States. As a result of the breakup, the plaintiff's shares were exchanged for shares of two new corporations. In denying the defendants' motion to dismiss the complaint on the ground that the plaintiff lacked standing to challenge activities that took place prior to the share exchange, the court observed:

> In *Rosenthal v. Burry Biscuit Corp., supra,* this Court stated that the sole purpose of § 327, Title 8 Del.C. was to prevent an evil, namely the purchase of shares for the purpose of bringing a derivative action based on transactions antedating such purchase. Plaintiff is not such a purchaser and the fact that she holds two pieces of paper rather than one as evidence of her ... investment ... should not, in my opinion, foreclose

her from complaining of acts antedating the incorporation of [the post-merger corporation] when such corporation is in effect a successor to [the pre-merger corporation].

136 A.2d at 562.

Similarly, in *Schreiber v. Carney,* 447 A.2d 17 (Del.Ch.1982), a merger resulted in the shareholders receiving a share-for-share exchange of stock with a newly formed holding company. The court held that the plaintiff maintained "equitable derivative standing" to bring a derivative action to challenge acts that occurred prior to the reorganization since the "merger had no meaningful effect on the plaintiff's ownership of the business enterprise...." *Id.* at 22. However, the court carefully distinguished cases involving "either cash-out mergers or mergers with outside or pre-existing corporations with substantial assets." *Id. See, e.g., Bonime v. Biaggini,* No. 6925, slip op. at 7, 1984 WL 19830 (Del.Ch. Dec. 7, 1984) (refusing to extend *Schreiber* where the new entity had a "corporate mix [that was] distinctly different from that of" the prior corporation).

In view of the principles reflected in cases such as *Schreiber* and in the recognition of the need to avoid the shielding of fraudulent transactions, the Delaware courts regularly indicate that there are two exceptions to the general rule that a plaintiff loses standing where he or she loses stock as a result of a merger. These exceptions apply (1) where the merger itself is the subject of a claim of fraud; *see, e.g., Cede & Co. v. Technicolor, Inc.,* 542 A.2d 1182, 1188–89 (Del.1988); or (2) where the merger is in reality a reorganization not affecting the plaintiff's ownership in the business enterprise, *see, e.g., Schreiber,* 447 A.2d at 22. *See generally Kramer,* 546 A.2d at 354; *Lewis v. Anderson,* 477 A.2d at 1046 n. 10.[7] In this case, however,

---

**7.** The Supreme Court of the United States reached a result consistent with the Delaware reorganization exception in *Gollust v. Mendell,* —— U.S. ——, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991). There the Court held that a plaintiff who had initiated a derivative action under section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), "may continue to pros- ecute the action after his interest in the issuer is exchanged in a merger for stock in the issuer's new corporate parent." *Id.* —— U.S. at ——, 111 S.Ct. at 2176. In *Gollust,* the plaintiff was a shareholder of Viacom International, Inc., and commenced a derivative action against various insiders of that company to recover alleged short-swing profits. Shortly after the plaintiff

Blasband does not contend that either of these exceptions applies to him.

Rather, the focus in this appeal is on *Lewis v. Anderson,* the seminal Delaware Supreme Court case concerning the contemporaneous ownership requirement in the merger context. The plaintiff in *Lewis v. Anderson,* a shareholder of Conoco, Inc. ("Old Conoco"), filed a derivative suit on its behalf against various Old Conoco officers and directors, asserting that "golden parachutes" granted by Old Conoco to these individuals constituted a waste of corporate assets. Shortly after the plaintiff filed his complaint, Old Conoco merged with Du Pont Holdings, Inc., a wholly owned subsidiary of E.I. Du Pont de Nemours and Company ("Du Pont") and the surviving corporation was renamed Conoco, Inc. ("New Conoco"). The merger provided for Old Conoco shareholders to receive common stock of Du Pont in exchange for their shares of Old Conoco. Du Pont became the sole shareholder of New Conoco. 477 A.2d at 1042.

The court rejected the plaintiff's contention that the derivative cause of action passed not to New Conoco or Du Pont, but rather to the former shareholders of Old Conoco. The court stated that under 8 *Del.C.* § 259(a), any derivative claim against the individual directors of Old Conoco was a property right of Old Conoco which passed to New Conoco following the merger.[8] 477 A.2d at 1044–47. Additionally, the court noted that neither of the two

exceptions to a shareholder's loss of standing upon merger which we have already described was applicable. *Id.* at 1046 n. 10. Finally, the court rejected the plaintiff's policy argument that permitting dismissal would leave a wrong unremedied, reasoning that the disposition of the plaintiff's suit was a matter for New Conoco's board of directors. *Id.* at 1050–51. Accordingly, the court concluded that "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Id.* at 1049. Because the plaintiff in *Lewis v. Anderson* asserted that he had standing only by virtue of his ownership of Old Conoco stock, the Supreme Court of Delaware did not have occasion to consider whether his indirect financial interest in the outcome of the litigation attributable to his ownership of shares *in Du Pont* gave him standing to bring the action after the merger.

However, we believe that the Delaware Supreme Court *sub silentio* recognized an indirect financial interest as a basis for standing in 1988 when in *Sternberg v. O'Neil,* 550 A.2d 1105 (Del.1988), apparently for the first time, it permitted a plaintiff to pursue a double derivative suit.[9] A double derivative action is identical in form to a traditional derivative action, except that in a double derivative the suit is brought on behalf of one corporation (*e.g.* a parent) to enforce a cause of action in

filed his complaint, Viacom International merged with a shell corporation under an agreement whereby the former Viacom International shareholders received a combination of cash and stock of the corporate parent of the newly formed company. *Id.* — U.S. at —, 111 S.Ct. at 2176–77. The Court held that the plaintiff's indirect financial interest in the outcome of the litigation attributable to his stock interest in the parent was sufficient to satisfy section 16(b)'s requirement of continued standing. *Id.* — U.S. at —, 111 S.Ct. at 2181. While we are bound by Delaware and not federal law in this diversity action we nevertheless naturally find *Gollust* to be instructive.

8. Section 259(a) provides that all rights, privileges, powers and franchises pass to the surviving or resulting corporation in the event of a merger.

9. The main issue in *Sternberg* was whether the Delaware courts could exercise personal jurisdiction over an Ohio corporation in an action brought by a shareholder of that corporation to redress the alleged wrongs to that company's wholly owned subsidiary, a Delaware corporation. The court never suggested that Delaware courts would not recognize the double derivative suit. This is not surprising as such suits are well recognized, though there are some jurisdictions that refuse to permit them. *See generally* 13 Charles R.P. Keating, Gail A. O'Gradney, *Fletcher Cyclopedia of Corporations* § 5977 (rev. ed. 1991). Indeed, double derivative actions have been recognized by the inferior Delaware courts for at least the last two decades. *See, e.g., Levine v. Milton,* 42 Del.Ch. 597, 219 A.2d 145 (1966). Nonetheless, we have found no case decided by the Delaware Supreme Court entertaining such an action prior to *Sternberg.*

favor of a related corporation (*e.g.* its subsidiary). As explained by one leading authority:

> The holding company owes a duty to use its control of the subsidiary to sue to right wrongs to it, and the shareholder may in effect compel specific performance of these connected duties in a double representative action. . . .
>
> In a 'double derivative' action, the shareholder is effectively maintaining the derivative action on behalf of the subsidiary, based upon the fact that the parent or holding company has derivative rights to the cause of action possessed by the subsidiary. The wrong sought to be remedied by the complaining shareholder is not only that done directly to the parent corporation in which he or she owns stock, but also the wrong done to the corporation's subsidiaries which indirectly, but actually, affects the parent corporation and its shareholders. *Notwithstanding that the recognition of double derivative suits relaxes the plaintiff's contemporaneous ownership requirement, the acceptance of the action acknowledges the realities of the changing techniques and structures of the modern corporation. The ultimate beneficiary of a double derivative action is the corporation that possesses the primary right to sue.*

13 Charles R.P. Keating, Gail A. O'Gradney, *Fletcher Cyclopedia of Corporations* § 5977, at 240 (rev. ed. 1991) (footnotes omitted) (emphasis added). *See also Sternberg,* 550 A.2d at 1107 n. 1 (citing *Fletcher); Brown v. Tenney,* 125 Ill.2d 348, 355–57, 126 Ill.Dec. 545, 548–49, 532 N.E.2d 230, 233–34 (Ill.1988).

We believe that this logic applies equally in the context at hand. The plaintiff's personal stake in the litigation in *Sternberg*— which was sufficient to confer standing— was no greater than Blasband's stake in this action. Blasband continues to own shares in Danaher, the parent of the corporation, Easco, that has the primary right to sue to redress the wrongs asserted in his complaint and thus he has an indirect financial interest in the litigation. Therefore, Blasband meets the continuing ownership

requirement to the same extent that a plaintiff in a double derivative action satisfies this requirement. Additionally, it is undisputed that Blasband was a shareholder at the time of the challenged transaction as required by 8 *Del.C.* § 327 and thus could not have purchased his shares to institute a strike suit challenging the investment of the proceeds of the Note Offering.

Overall, we are faced with a case where the literal requirements as well as the purposes underlying both components of shareholder derivative standing—ownership at the time of the challenged transaction and continuing ownership during the litigation—have been satisfied in accordance with Delaware law. Yet the appellees urge that the complaint was properly dismissed on the ground that Blasband lacks standing. We acknowledge that their position is understandable, as there is language in *Lewis* that could be read as foreclosing any possibility of maintaining a derivative action in the merger context we face. Furthermore, the facts of *Lewis* closely parallel this case. But this case differs critically from *Lewis* in a legal sense in that the plaintiff in that case seems not to have claimed to have standing as a shareholder of Du Pont, the parent corporation. Therefore, there is no indication in *Lewis* that the Supreme Court of Delaware considered an argument comparable to that now raised by Blasband, *i.e.,* that he has standing as a shareholder of Danaher.

To be sure, one could argue that, if the plaintiff could have merely amended his complaint to allege a cause of action on behalf of Du Pont, the court had no need to make an analysis of his possible standing as an Old Conoco shareholder. Yet, as the plaintiff in *Lewis* apparently did not attempt to amend his complaint to bring a derivative action on behalf of New Conoco by virtue of his status as a Du Pont shareholder, it was not necessary for the court to address the issue. Additionally, as will be apparent from our discussion below, even if the plaintiff had pursued such an argument, the merger would have implicated the adequacy of the plaintiff's demand

efforts which is a further reason why it may have been premature for the court to address this potential standing argument. Importantly, moreover, the court could not have *implicitly* rejected the plaintiff's standing to bring an action on behalf of the parent without thereby calling into question the standing of anyone in Delaware to bring a double derivative suit. For purposes of standing, there is simply no principled distinction between a derivative action brought by a shareholder of a parent corporation on behalf of its subsidiary following a merger to redress wrongs done to the subsidiary prior to the merger where the plaintiff continuously has held a financial interest in the subsidiary directly, and then after the merger indirectly, and a conventional double derivative action outside the merger context. Therefore we will not assume that the court in *Lewis* intended to reject the plaintiff's standing as a shareholder in Du Pont.

*Lewis v. Anderson* recognizes the well-established principle that the board of directors has exclusive control over the affairs of the corporation, "including the disposition of all choses in action[,]" and recognizes as well that where there has been a merger, this responsibility passes not to the shareholders of the pre-merger company but to the board of the surviving company. 477 A.2d at 1050 n. 19. However, the Supreme Court of Delaware also has repeatedly recognized the right of shareholders to sue on behalf of the corporation when the board refuses to assert a claim rightly belonging to it. *See Pogostin v. Rice*, 480 A.2d 619, 624 (Del.1984); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984). Here, Blasband alleges that the persons in control of both Danaher and *post*-merger Easco have refused to assert such claims. Accordingly, our result is entirely consistent with *Lewis v. Anderson*'s recognition that choses in action pass to the surviving corporation upon a merger. While there will always be a tension between the managers' and directors' right to manage the corporation and the shareholders' right to impinge on this managerial freedom through derivative actions, this tension traditionally has been dealt with by the re-

quirement of demand, an issue we discuss below. *See generally Aronson v. Lewis*, 473 A.2d 805, 811–12 (Del.1984). But a standing determination raises issues discrete from impingement of managerial freedom and, under the facts of this case, we cannot say that Blasband lacks standing to maintain this action.

We acknowledge that this case may not fit neatly into existing Delaware corporation law. However, we are guided by the recognition of the Delaware courts that "[a] shareholder derivative suit is a uniquely equitable remedy...." *Levine v. Smith*, 591 A.2d 194, 200 (Del.1991). Thus, the Delaware courts have consistently refused to apply its corporate law rigidly where to do so would be inequitable. *See, e.g., Schreiber*, 447 A.2d at 22 ("it is clear that the provisions of 8 *Del.C.* § 327 are not inflexible standards and this Court, as a Court of Equity, must examine carefully the particular circumstances of each case"); *see also Cede & Co.*, 542 A.2d at 1189 (court's decision "[b]ased on ... policy concerns, and considerations of equity"). Further, the Delaware courts have observed in shareholder actions that "equity will not suffer a wrong without a remedy...." *In re: Tri–Star Pictures, Inc. Litigation*, No. 9477, 1992 WL 37304, at * 9 (Del.Ch. Feb. 21, 1992) (quoting *Weinberger v. UOP, Inc.*, No. 5642, slip op. at 20–21, 1985 WL 11546 (Del.Ch. Jan. 30, 1985) *aff'd*, 497 A.2d 792 (Del.1985) (table)).

Hence, our conclusion that Blasband has standing is bolstered by the fact that a dismissal of Blasband's complaint may well leave a wrong unremedied. In contrast to *Lewis v. Anderson*, where the court observed that New Conoco, the successor company, had an opportunity to seek relief for the wrongs alleged in that case, 477 A.2d at 1050–51, here Blasband alleges that the successor company has a cause of action that it refuses to pursue. This is precisely where Delaware courts permit shareholders to step in and sue derivatively.

We also point out that we doubt that Blasband would be entitled to bring a direct action to recover for his alleged inju-

ries as it is clear that Delaware courts would treat any claim asserted by him individually as derivative in nature: "[T]o have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation.... For a plaintiff to have standing to bring an individual action, he must be injured *directly* or *independently* of the corporation." *Kramer v. Western Pacific Indus.*, 546 A.2d at 351 (emphasis in original). In *Kramer*, the court held that actions charging waste or mismanagement which depress the value of stock may not be maintained directly, but must be brought derivatively on behalf of the corporation.[10] Furthermore, Blasband does not challenge the propriety of the merger terms themselves. *See id.* at 353–54.[11]

We also believe that our result may not be avoided by an argument that Blasband may assert a claim derivative solely to Danaher on a theory that the Danaher board's failure to pursue redress on behalf of Easco rose to the level of a breach of fiduciary duty. Under this theory, there would be two alleged wrongs: the alleged wrongs committed by the Rales brothers upon Easco by the investment of the proceeds of the Note Offering and Danaher's failure to seek redress for those acts. A derivative suit to recover for the latter elusive, continuing breach would be highly problematic. For example, a court would have to determine with precision the point in time when Danaher's failure to act became a breach of fiduciary duty, giving all Danaher shareholders at that time the right, upon satisfying the demand requirement, to maintain a derivative action. It does not matter that *Blasband* necessarily would be a shareholder at this point in time because if he properly may maintain such an action then anyone could buy into the suit by purchasing shares of Danaher so long as it is determined that that shareholder owned stock at the time the omission rose to the level of a breach of fiduciary duty.[12]

■ We realize that in limited circumstances, Delaware courts have recognized an exception to the contemporaneous ownership requirement where there has been a "continuing wrong." *Schreiber v. R.G. Bryan*, 396 A.2d 512 (Del.Ch.1978); *Newkirk v. W.J. Rainey, Inc.*, 76 A.2d 121 (Del.Ch.1950). *See also Brambles USA, Inc. v. Blocker*, 731 F.Supp. 643 (D.Del. 1990); *Chirlin v. Crosby*, No. 6632, slip op., 1982 WL 17872 (Del.Ch. Dec. 7, 1982);

---

**10.** Thus, Blasband could not claim that the investment in junk bonds caused him direct injury, as this rationale was squarely rejected in *Kramer*:

> Kramer's position is tantamount to saying that, in the context of a cash-out merger, whenever a shareholder asserts a claim against management for breach of fiduciary duty based upon waste or other acts causing a monetary loss to the corporation, the shareholder's claim should also be construed: (i) as asserting a 'special injury' to the shareholder, as distinct from the corporation; and (ii) as amounting to a *direct* attack on the terms of the merger, thus giving the shareholder standing to continue, or bring forward, a suit after the merger. Such a position is contrary to well-established principles of Delaware law and cannot be accepted by this Court.

*Kramer*, 546 A.2d at 354 (emphasis in original). *See also In re Tri–Star Pictures, Inc. Litigation*, No. 9477, slip op., 1990 WL 82734 (Del.Ch. June 14, 1990).

**11.** We conclude that the class action filed in *Sullivan v. Easco Hand Tools*, No. 11427 (Del. Ch.), which sought to prevent Easco's merger into Danager would not have afforded recovery for the breach of fiduciary duty alleged in Blasband's complaint. To the extent that the class in *Sullivan* sought damages for its direct injuries, the action would have been inconsistent with *Kramer*, as discussed above. Moreover, the complaint in *Sullivan* does not even suggest that the Rales brothers breached their fiduciary duties to Easco and thus is unrelated to Blasband's claims.

We also observe that while a dissenting shareholder in certain circumstances may have a right to an appraisal where the shareholder contends that he or she has received an inadequate price for the shares and has objected to the merger terms, the appellees do not contend that this procedure was available to Blasband and, of course, therefore do not contend that it afforded him an adequate remedy. In any event, even if Blasband has appraisal rights, that would not provide a remedy to Easco for the breaches of fiduciary duty alleged in Blasband's complaint.

**12.** Of course, if Blasband could assert a claim derivative solely to Danaher then he certainly has standing as he acquired his Danaher shares when Danaher acquired Easco.

*cf.* 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1828, at 65 (2d ed. 1986) ("federal courts generally have rejected the contention that the entire series of events constitutes a single transaction—the so-called 'continuing wrong' notion—entitling plaintiff to bring suit for injuries suffered by the corporation subsequent to plaintiff's acquisition of stock"). However, because every wrongful transaction may be viewed as a continuing wrong to the corporation until remedied, *Newkirk*, 76 A.2d at 123, the "test to be applied in such situations concerns whether the wrong complained of is in actuality a continuing one or is one which has been consummated.... [W]hat must be decided is when the specific acts of alleged wrongdoing occur, and not when their effect is felt." *Schreiber*, 396 A.2d at 516. Accordingly, a derivative action on behalf of Danaher would not be cognizable under the continuing wrong theory, for it is clear that such an action would be predicated upon the investment in junk bonds rather than the mere failure to file a lawsuit or otherwise seek redress for that transaction. *See Newkirk*, 76 A.2d at 124 ("[T]he allegations concerning the conspiracy refer back to the alleged original wrongs, all of which occurred before these plaintiffs acquired their stock. These wrongful acts cannot by the specious device of employing appropriate language be transferred into continuing wrongs for the purpose of over-riding" section 327.); *see also Brambles USA, Inc.*, 731 F.Supp. at 652 (court declined to apply continuing wrong exception in part because, "[a]s a matter of policy, one who buys shares with knowledge of a purported wrongdoing should not be permitted to bring suit to challenge that wrongdoing").

 In the final analysis, Blasband's action is akin to a double derivative suit. He has filed an action as a Danaher shareholder to pursue a cause of action on behalf of Danaher's wholly owned subsidiary, Easco. Blasband was a shareholder of the company allegedly wronged at the time of the challenged transactions. Following these transactions, Easco merged into a new company, and survived as a wholly owned subsidiary of Danaher. As *Lewis v. Anderson* makes clear, all of "Old Easco's" causes of action survived as well, passing to "New Easco," but here "New Easco" has not pursued its cause of action. Throughout this time, Blasband has maintained a financial interest in Easco, although after the merger his interest became indirect. Had Blasband been given shares of the post-merger Easco, there would be no doubt that he could now maintain a derivative action on its behalf. Inasmuch as Delaware recognizes double derivative actions, the fact that Blasband has been given shares of Easco's parent rather than the new subsidiary should be of little consequence.[13] Accordingly, we hold that, despite the rather broad language in *Lewis v. Anderson*, Blasband has satisfied Delaware's statutory and common law standing requirements to maintain this derivative action.[14]

---

**13.** We note that permitting this claim on behalf of Easco would not result in a windfall to Danaher as suggested by the district court. *See* 772 F.Supp. at 857. Because Easco's choses in action were *not destroyed by the merger*, in theory at least they should have been reflected in the purchase price that Danaher paid for Easco in Danaher shares. Thus, by pursuing the cause of action against the Rales brothers, Danaher would not be receiving a windfall any more than it would be receiving a windfall by pursuing a pre-merger account receivable. *See Lewis v. Anderson*, 477 A.2d at 1048 n. 15 ("[B]oth the arguable value of the claim possessed by Old Conoco as well as Old Conoco's liability on the contract passed to New Conoco under § 259(a). Hence there would be no reduction in Old Conoco's net worth."); *id.* at 1050 ("[I]f New Conoco were to proceed against Old Conoco's former management and obtain a recovery, it would not constitute a windfall.... New Conoco would be simply pursuing Old Conoco's assets and minimizing its liabilities.")

**14.** The district court dismissed Blasband's standing to bring a double derivative action because it believed that "[t]he difficulty with characterizing this action as a double derivative is that [Blasband] has not alleged (nor does he seek leave to amend the Complaint to allege) that Danaher was an Easco stockholder at the time of the purported wrongdoing. Thus, Danaher apparently cannot satisfy § 327's contemporaneous ownership requirement." 772 F.Supp. at 857. However, while a double derivative plaintiff's right to commence an action typically is "based upon the fact that *the parent or holding*

## IV.

## DEMAND

### A.

### General Principles

■ As the United States Supreme Court recently recognized, Rule 23.1 "does not *create* a demand requirement of any particular dimension. On its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings." *Kamen v. Kemper Financial Services, Inc.*, — U.S. —, —, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991) (emphasis in original). The substantive requirements of demand are a matter of state law. *See id.* — U.S. at —, 111 S.Ct. at 1716–17; *Gonzalez Turul v. Rogatol Distributors, Inc.*, 951 F.2d 1, 2 & n. 3 (1st Cir.1991);

*RCM Securities Fund, Inc. v. Stanton*, 928 F.2d 1318, 1330 (2d Cir.1991); *Starrels*, 870 F.2d at 1170; *Lewis v. Curtis*, 671 F.2d at 785. Thus, Delaware law governs the substantive requirements of Blasband's claims, including the demand component. *See* 772 F.Supp. at 854.

While Delaware courts routinely permit a shareholder to bring a derivative suit where those in control of the corporation refuse to assert a claim belonging to it, *see Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984); *Aronson v. Lewis*, 473 A.2d at 811, "[a] cardinal precept of the General Corporation Law of the State of Delaware is that the directors, rather than shareholders, manage the business and affairs of the corporation." (citing 8 *Del.C.* § 141(a)); *see also Levine v. Smith*, 591 A.2d 194, 200

company has derivative rights to the cause of action possessed by the subsidiary[,]" 13 *Fletcher Cyclopedia of Corporations*, § 5977 at 240 (emphasis added), that Danaher would not be permitted to file a traditional derivative action under the facts of this case does not undermine the conclusion that *Blasband* has standing. Section 327 provides that "[i]n any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that *the plaintiff* was a stockholder of the corporation at the time of the transaction of which he complains...." 8 *Del.C.* § 327 (emphasis added). As we discuss above, the purpose of this provision is simply to prevent strike suits. As Blasband satisfies both the letter and the intent of this provision, we need go no further.

Additionally, one might argue that section 327's requirement that "the plaintiff [be] a stockholder *of the corporation* at the time of the transaction ..." means that Blasband must have been a *Danaher* stockholder at that time to bring this derivative suit. Clearly, however, the statute contemplates that the corporation made the nominal defendant at the time of the complaint will be the same corporation that was allegedly harmed by the challenged transaction. Where the corporation merges and the plaintiff receives shares of the successor corporation, section 327 poses no obstacle to a derivative suit on behalf of the successor corporation for pre-merger acts, because the successor corporation succeeds to the cause of action under section 259, as explained in *Lewis v. Anderson.* The only difference here is that Blasband has received shares of the successor's parent rather than the successor corporation itself. Yet, since the Delaware courts have recognized a shareholder's right to bring a double derivative suit, it follows that this fact in itself is an insufficient basis to deny standing.

We are aware that Blasband has stated in the district court and before us that he is not bringing a double derivative suit. Rather he contends that he has "successor derivative standing." However, Blasband has in fact argued that he meets Delaware's statutory and common law standing requirements, an argument with which essentially we agree, and the appellees have addressed these arguments in detail. Thus, any disagreement lies in the name accorded the cause of action, not its substance. In any event while this action is a first cousin to a double derivative suit it is not a twin so that Blasband's concession that this is not a double derivative action technically is correct. Furthermore, "[w]hen an issue or claim is properly before the court [of appeals], the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Financial Services, Inc.*, — U.S. —, —, 111 S.Ct. 1711, 1718, 114 L.Ed.2d 152 (1991). While we retain the discretion to treat an unasserted claim as waived, "if a court undertakes to sanction a litigant by deciding an effectively raised claim according to a truncated body of law, the court should refrain from issuing an opinion that could reasonably be understood by lower courts and nonparties to establish binding precedent on the issue decided." *Id.* — U.S. at — n. 5, 111 S.Ct. at 1718 n. 5. But in this case, inasmuch as Blasband *has* effectively asserted his claim, to hold that he has waived his right to maintain the action on the ground that he stated that he is not bringing a double derivative action, would be to elevate form over substance.

(Del.1991); *Spiegel v. Buntrock,* 571 A.2d 767, 772–73 (Del.1990); *Pogostin,* 480 A.2d at 624. The decision to bring a lawsuit or to refrain from litigating a claim on behalf of the corporation is a decision concerning the management of the corporation and consequently is the responsibility of the directors. *Levine,* 591 A.2d at 200; *Spiegel,* 571 A.2d at 773. Accordingly, because a derivative action impinges on the managerial freedom of directors, the demand requirement "exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits." *Aronson,* 473 A.2d at 811–12. *See also Levine,* 591 A.2d at 200 (demand requirement "designed to strike a balance between a shareholder's claim or right to assert a derivative claim and a board of directors' duty to decide whether to invest the resources of the corporation in pursuit of the shareholder's claim of corporate wrong"); *Spiegel,* 571 A.2d at 773 ("The purpose of pre-suit demand is to assure that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation, to decide whether to invest the resources of the corporation in litigation, and to control any litigation which does occur."). Accordingly, it is clear that the demand requirement is not a mere formality, but rather is an important aspect of Delaware's substantive law. *See Levine,* 591 A.2d at 207.

Blasband does not claim that he has made a proper demand on either Danaher's or Easco's board of directors. Thus, we are concerned not with the adequacy of the demand but rather with demand futility, *i.e.,* whether Blasband should be excused from making a proper demand.

This inquiry "is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." *Aronson,* 473 A.2d at 812. As recently restated in *Levine,* the Delaware Supreme Court in *Aronson* established a two-part test to evaluate claims of demand futility:

> In determining the sufficiency of a complaint to withstand demand futility, the controlling legal standard is well established. The trial court is confronted with two related but distinct questions: (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.

*Levine,* 591 A.2d at 205. *Accord, Spiegel,* 571 A.2d at 774; *Grobow v. Perot,* 539 A.2d 180, 186 (Del.1988); *Pogostin,* 480 A.2d at 624; *Aronson,* 473 A.2d at 814.

1.

Director Disinterest and Independence

 Under the first prong of the *Aronson* test, the court reviews the factual allegations of the complaint to determine whether they create a reasonable doubt as to the disinterestedness and independence of the directors at the time the complaint was filed. *Pogostin,* 480 A.2d at 624; *see also Aronson,* 473 A.2d at 814 ("As to ... directorial independence and disinterestedness, the court reviews the factual allegations to decide whether they raise a reasonable doubt, as a threshold matter, that the protections of the business judgment rule are available."). Directorial interest exists whenever divided loyalties are present, or where the director stands to receive a personal financial benefit from the transaction not equally shared by the shareholders. *Pogostin,* 480 A.2d at 624; *Aronson,* 473 A.2d at 812. Directorial independence "means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson,* 473 A.2d at 816. "When lack of independence is charged, a plaintiff must show that the Board is either dominated by an officer or director who is the proponent of the challenged transaction or that the Board is so under his influence that its discretion is 'sterilize[d].'" *Levine,* 591 A.2d at 205 (quoting *Zapata Corp. v. Maldonado,* 430 A.2d 779, 784 (Del.1981)); *see also Grobow,* 539 A.2d at 188 ("plaintiffs must plead particularized facts demonstrating either a financial interest or entrenchment"); *Aron-*

*son*, 473 A.2d at 816 ("a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling' ") (quoting *Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del.Ch.1971)). A plaintiff may not bootstrap allegations of futility merely by pleading that the directors participated in the challenged transaction or that they would be reluctant to sue themselves. *Pogostin*, 480 A.2d at 625; *Aronson*, 473 A.2d at 817–18.

### 2.

### The Challenged Transaction

■ If a plaintiff does not satisfy the first prong of the *Aronson* test, there is a rebuttable presumption that the business judgment rule attaches to the challenged transaction. *Levine*, 591 A.2d at 206. Nevertheless, a derivative action is not necessarily barred if the plaintiff can demonstrate that the demand would have been futile under *Aronson*'s second prong. At that point the inquiry

> focuses on the substantive nature of the challenged transaction and the board's approval thereof. A court does not assume that the transaction was a wrong to the corporation requiring corrective measures by the board. Rather, the transaction is reviewed against the factual background of the complaint to determine whether a reasonable doubt exists at the threshold that the challenged action was a valid exercise of business judgment.

*Pogostin*, 480 A.2d at 624. Proper business judgment includes "both substantive due care (purchase terms) ..., and procedural due care (an informed decision)...." *Grobow*, 539 A.2d at 189. If the plaintiff creates a reasonable doubt that the challenged transaction was a valid exercise of business judgment, then "it may be inferred that the Board is *incapable* of exercising its power and authority to pursue the derivative claims directly." *Levine*, 591 A.2d at 205 (emphasis in original).

Under the "transaction" prong, the court generally evaluates the futility of requiring demand upon the board at the time of the transaction as distinguished from the inquiry under *Aronson*'s first prong which looks to the time the complaint is filed. Typically, however, the composition of the board will be the same at both times so that no consequence flows from the difference in temporal focus. *See Harris v. Carter*, 582 A.2d 222, 229–30 (Del.Ch.1990).

### B.

### Demand Applied

### 1.

### On Which Board is Demand Made

■ In view of the merger, we are presented with difficult questions concerning application of *Aronson's* demand futility formulation. Yet our inquiry under the first *Aronson* prong is simplified for it is clear that, regardless of the board or boards on which the demand for action would ordinarily be required, we review the factual allegations of the complaint to determine whether they create a reasonable doubt as to the disinterestedness and independence of the directors at the time the complaint was filed. *Pogostin*, 480 A.2d at 624. The more complex analysis is under the second prong. In this regard we note that it would seem logical, as Blasband asserts, to look to the board that existed at the time of the transaction in determining whether the challenged transaction was the product of a valid exercise of business judgment. Thus, Blasband argues essentially that, since the challenged transaction is the investment of the proceeds from the Note Offering, it is the Easco board's business judgment which is relevant under this inquiry. The appellees contend, however, that demand futility should focus on the Danaher board's business judgment at the time the complaint was filed and the district court agreed:

> Thus, the *Aronson* formulation is not entirely applicable in this case because the *Easco* board allegedly approved the challenged transaction but plaintiff's de-

mand futility allegations concern the Danaher board, and there is no allegation that the membership of the two boards is identical. Plaintiff's argument, under *Aronson*'s so-called second prong, that the magnitude of Easco's junk bond investments creates a reasonable doubt that the *Easco* board exercised sound business judgment is, therefore, irrelevant to the question of whether demand on the *Danaher* board is futile.

772 F.Supp. at 855 (emphasis in original).

Inasmuch as this case is similar to a double derivative action, we believe that the demand required of a plaintiff in a double derivative action is applicable here and thus since Blasband did not make the demand, futility must be determined with respect to a demand required in a double derivative action. In general, to bring a double derivative suit, "[a] plaintiff shareholder must make a demand twice, once of the subsidiary company and once of the holding company." 13 *Fletcher Cyclopedia of Corporations* § 5977, at 13 (Supp. 1991) (footnote omitted); *see also Brown*, 125 Ill.2d at 361, 126 Ill.Dec. at 550–51, 532 N.E.2d at 235–36 ("a double derivative action may be maintained by a shareholder of record in a holding company, after due demand is made to, and rejected by, the subsidiary and the holding company"). While we have uncovered no Delaware case considering the demand requirements in a double derivative suit, we believe the Delaware Supreme Court would require demand upon both the parent and subsidiary corporations in such a suit in view of the strong policy of preventing shareholders from impinging upon the managerial freedom of the board of directors. *See generally Aronson*, 473 A.2d at 811–12. Indeed, inasmuch as that court has indicated that both the parent and subsidiary are indispensible parties in a double derivative action, it follows that demand must be made upon both. *See Sternberg*, 550 A.2d at 1124. Accordingly, we must determine whether Blasband has satisfied the demand requirement by demonstrating demand futility as ap-

plied to both the Easco and Danaher boards. Of course, it also follows that Easco should be a party to this case and, as it is not, Blasband may move on the remand we are ordering to join it as a nominal defendant.

### 2.

### Director Disinterest and Independence

Blasband's assertion that the Easco and Danaher boards were not independent is based on the boards' written response to his request for information. Blasband argues that the boards' letter demonstrates that any further demand would be futile because the boards denied all wrongdoing by Easco officials, refused to provide easily obtainable information, and refused to conduct any investigation in response to his letter. Further, Blasband contends that he informed the boards that they possessed information that might demonstrate substantial waste, and that the response demonstrated "a complete unwillingness by the Danaher board to conduct, or allow a stockholder to conduct, an investigation into the conduct of the Rales [b]rothers, who dominate the company. This behavior by the board casts into reasonable doubt its independence from the Rales brothers...." Reply Brief at 16; *see also* Opening Brief at 36–38.[15]

Appellees rejoin first that a response to an inadequate demand should never be considered in determining demand excusal, and second that in any event the response casts no reasonable doubt on the ability of the boards to consider a pre-suit demand. Appellees maintain that if we accept Blasband's reasoning, shareholders would be able to circumvent the demand requirement by making an inadequate demand and then arguing that the response to the inadequate demand demonstrates that a proper demand would be futile, thereby reducing the demand requirement to a meaningless formality.

While there is some appeal to this reasoning, the appellees offer no support for the proposition that a court may not consid-

---

**15.** Although Blasband refers merely to the Danaher board, the letter was sent to both the Danaher and Easco boards, and counsel responded to the letters on behalf of both boards.

er a board's reply to an inadequate demand in considering demand futility. *Shlensky v. Dorsey*, 574 F.2d 131 (3d Cir.1978), upon which they rely, is inapposite. In that case the court considered whether four letters sent by the plaintiffs' counsel constituted adequate efforts under Rule 23.1. In concluding that the letters were inadequate the court did not consider the demand futility issue.[16]

In fact the appellees' fears are unwarranted since, regardless of the source of a derivative plaintiff's allegations of futility, the plaintiff always retains the burden of demonstrating a reasonable doubt as to the disinterestedness and independence of the directors. Thus, considering the response to an inadequate demand on the futility issue in no way lessens a plaintiff's burden of proof required to justify the absence of a demand. Moreover, in the typical case, the plaintiff does not allege both that an adequate demand was made *and* that demand is excused. *Cf. Spiegel*, 571 A.2d at 775 ("By making a demand, a stockholder tacitly acknowledges the absence of facts to support a finding of futility.").[17]

Nevertheless, even considering the Easco and Danaher boards' December 17, 1990 letter, Blasband fails to allege particularized facts demonstrating that the directors were incapable of considering a proper demand. Blasband's letter was merely a request for information. Since it was not a proper demand, the boards were not obligated to take action pursuant to the letter. As the district court noted in *Allison on behalf of General Motors Corp. v. General Motors Corp.*, 604 F.Supp. 1106 (D.Del.), *aff'd*, 782 F.2d 1026 (3d Cir.1985) (table):

> A generalized claim that the Board failed to take action on the alleged wrongs set out in the demand letter as of the date of filing of the complaint does not in any

way explain *why* the Board is disabled from assuming control of the litigation. This claim only alerts the Board that a shareholder believes management has done something which requires a response by the Board. At a minimum, plaintiff must offer some particularized legally cognizable reason as to why the ... Board is unable to redress the alleged wrong.

*Id.* 604 F.Supp. at 1113 (emphasis in original). *See also Lewis v. Graves*, 701 F.2d at 249 ("bald charges of mere failure to take corrective action are ... inadequate to demonstrate futility"); *Mozes on behalf of General Electric Co. v. Welch*, 638 F.Supp. 215, 219 (D.Conn.1986) ("mere knowledge of wrongs and failure to immediately institute suit, without additional factors being present, are inadequate reasons for a plaintiff to assume the futility of demand").

Further, the December 17 letter was not, as Blasband asserts, a "declaration of innocence of wrongdoing." The letter merely stated that Easco complied with its disclosure requirements under the federal securities laws. *See* app. at 28–29. There is no indication that the boards considered whether a potential claim existed for breach of fiduciary duty under state law, which is the basis of this action. Thus, the letter does not create a reasonable doubt that the boards would have been incapable of considering a proper demand or that the Rales brothers exercised such domination and control over the boards that their discretion was "sterilized." *See Levine*, 591 A.2d at 205.

Blasband further seeks to support his claim by asserting that the information requested was easily obtainable and thus the boards' response that the request would be "time consuming and highly disruptive of the day-to-day management,"

---

16. Similarly, *Herd v. Major Realty Corp.*, No. 10707, slip op. at 17–18, 1990 WL 212307 (Del. Ch. Dec. 21, 1990); *Brook v. Acme Steel Co.*, No. 10276, slip op. at 8, 1989 WL 51674 (Del.Ch. May 11, 1989); and *Seibert v. Harper & Row Publishers, Inc.*, No. 6639, slip op. at 8, 1984 WL 21874 (Del.Ch. Dec. 5, 1984), which appellees cite, do not stand for the proposition that a court may not consider the response to an inadequate demand in considering a claim of demand futility.

17. This case is, of course, distinguishable from *Spiegel* in that the shareholder in *Spiegel* actually made a demand after the complaint was filed. Blasband is not taking an inconsistent position since he acknowledges that he has not made an adequate demand.

demonstrates that the boards were incapable of exercising independence with regard to the subject matter of this litigation. While we acknowledge that it is not readily apparent why it would have been difficult to supply Blasband with the information he requested, we nevertheless recognize that the failure to provide information does not in itself create a reasonable doubt as to the disinterestedness or independence of a board. *Seibert v. Harper & Row Publishers, Inc.*, No. 6639, slip op. at 8 (Del.Ch. Dec. 5, 1984). Moreover, a board's failure to take action, even if it is aware of wrongdoing, does not demonstrate futility. *Cramer v. General Tel. & Electronics Corp.*, 582 F.2d 259, 276 (3d Cir.1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979); *Richardson v. Graves*, No. 6617, slip op. at 9, 1983 WL 21109 (Del.Ch. June 17, 1983) ("it is the Board's inaction in most every case which is the *raison d'être* for [Delaware Court of Chancery] Rule 23.1" which is comparable to Fed.R.Civ.P. 23.1). Delaware courts have steadfastly applied the requirement that lack of director disinterest or independence be pleaded with particularity. *See Aronson*, 473 A.2d at 816 ("The shorthand shibboleth of 'dominated and controlled directors' is insufficient."). The December 17 letter does not meet this requirement.[18] Consequently, Blasband has not satisfied the first *Aronson* prong with respect to demand futility as to either board, though as we later explain he should be given an opportunity to amend his complaint to satisfy this prong if he can do so.

### 3.

### The Challenged Transaction

■ Since Blasband has not satisfied the first prong of the *Aronson* test, there is a rebuttable presumption that the business judgment rule attaches to the challenged transaction. *Levine*, 591 A.2d at 206. We thus consider the second prong and on this point note that, as we have already observed, the parties dispute as to which board it applies. Since the test is designed to assess whether the board that was responsible for the challenged transaction is entitled to the protections of the business judgment rule, *Aronson*'s second prong clearly has no applicability to any other board. Thus, the challenged transaction test of demand futility can only establish whether demand would have been futile as to the Easco board. Therefore while demand futility can be demonstrated, if at all, as to the Danaher board only under the first prong, it can be shown as to the Easco board under either prong.

■ Blasband has pleaded sufficient facts demonstrating that at the time of the challenged transaction the pre-merger Easco board was incapable of responding to a demand under the second prong of the *Aronson* test. Assuming the truth of the pleadings, the complaint alleges that the appellees made a series of highly speculative investments in debt securities using the proceeds of a public offering which, according to its prospectus, were to be more conservatively invested. Moreover, the complaint alleges that these investments were not made for any legitimate corporate purpose, but rather were for the benefit of Drexel, which was experiencing financial difficulties and which had a longtime relationship with the Rales brothers. Clearly, Blasband has pleaded facts raising at least a reasonable doubt that the appellees' use of proceeds from the Note Offering was a valid exercise of business judgment. Thus, "it may be inferred that the Board is *incapable* of exercising its power and authority to pursue the derivative

---

18. *See generally* Dennis J. Block, Stephen A. Radin & James P. Rosenzweig, *The Role of the Business Judgment Rule in Shareholder Litigation at the Turn of the Decade*, 45 Bus.Law. 469, 478–79 (1990) ("it is settled that, under Delaware law, demand will not be excused merely because a majority of directors are named as defendants, approved the challenged transaction, are threatened with personal liability for approving the transaction, failed to take corrective action prior to the filing of the lawsuit, refused to reconsider a challenged transaction or rejected a prior demand, would have to sue themselves, are alleged in conclusory language to be dominated and controlled by those benefitting from the challenged conduct, or have financial ties to the corporation") (collecting cases) (footnotes omitted).

claims directly." *Levine*, 591 A.2d at 205 (emphasis in original).

■ However, the pre-merger Easco board's business judgment or lack thereof may be thought to be entirely irrelevant at any time *other* than the time of the filing of the complaint.[19] *See generally, Starrels*, 870 F.2d at 1172–76 (concurring opinion). A similar problem was presented in *Harris v. Carter*, 582 A.2d 222, 229–30 (Del.Ch.1990). In that case a group of former shareholders/directors (the "Carter group") of Atlas Energy Corporation ("Atlas") sold a control block of stock to another group of individuals (the "Mascolo group") and appointed the latter as directors of Atlas. The plaintiff in *Harris* was a minority shareholder who filed a class action complaint shortly after the change in control from the Carter group to the Mascolo group. The plaintiff sought to enjoin and rescind certain transactions effected by the Mascolo group and to recover damages for breach of fiduciary duty. Additionally, the plaintiff sought damages from the Carter group in connection with the sale of control of Atlas to Mascolo.

Sometime after the plaintiff filed his original complaint, the transaction that the plaintiff sought to enjoin was abandoned. *See* 582 A.2d at 223–24. Thereafter, the plaintiff filed an amended complaint purporting, for the first time, to assert claims derivatively on behalf of Atlas. Essentially, the amended complaint sought damages against the Carter group for breaching its duty of care owed to Atlas by negligently selling and transferring control of the company to the Mascolo group. The plaintiff contended that a reasonable investigation would have revealed that Mascolo and his group were dishonest. Additionally, the plaintiff named the members of the Mascolo group as defendants, contending that they looted the company for personal gain through a series of complex corporate transactions. *Id.* at 224. In his amended complaint the plaintiff alleged that demand

was excused since Atlas' directors were neither disinterested nor independent at the time the action was instituted.[20] Following the filing of the original complaint but before the filing of the amended complaint, the Mascolo group transferred control of the company to a new group of directors. The amended complaint did not allege that demand on the *new* board would be futile. *Id.* at 225. The Carter and Mascolo defendants each moved to dismiss on the ground that the plaintiff failed to comply with the demand requirements.

The court initially held that, although the original complaint was purportedly brought individually, the claims were actually derivative in nature. Therefore, the court held that futility should be measured at the time the original complaint was filed. *Id.* at 229. Additionally, the court held that the original complaint's allegations of waste and fraud were sufficient to raise a reasonable doubt that the challenged transactions would qualify for business judgment protection, and thus demand was excused as futile. But what the court regarded as the "interesting" question was whether the plaintiff also was required to allege facts excusing demand at the time of the amended complaint, as by then there was a new board which presumably was disinterested with respect to a potential claim against the Mascolo and Carter groups. *Id.*

The court observed that the *Aronson* test for demand futility focuses upon whether the board *that approved the challenged transaction* should be entitled to rely on the business judgment rule. However, since a later change in board composition would not affect this inquiry, "the existence of a new, wholly independent board at the time of the institution of a suit might under the *Aronson* test be thought wholly irrelevant. For this reason *Aronson* has been criticized as focusing the test for futility on the wrong time." *Id.* (citing *Starrels*, 870 F.2d at 1174–75 (concurring

---

**19.** Although the merger resulted in a change of ownership, there is no indication as to whether the composition of the Easco board changed following the merger.

**20.** The plaintiff did not make any allegations regarding demand in his original complaint as it was not filed as a derivative action.

opinion)).[21] The court suggested that this apparent anomaly stemmed from the fact that the *Aronson* court focused on the typical case in which the board that approved the challenged transaction and the board upon whom a demand could be made are the same. *Id.* 582 A.2d at 229–30.[22] Thus, although the time frame of the second prong of *Aronson* will work well in the vast majority of cases:

> In the special case, however, where there is a change in board control between the date of the challenged transaction and the date of suit, it might open the way to error to focus on the board existing at the time of the challenged transaction. What, in the end, is relevant is not whether the board that approved the challenged transaction was or was not interested in that transaction but whether the present board is or is not disabled from exercising its right and duty to control corporate litigation.

> I do not consider that *Aronson* intended to determine that demand under [Delaware Court of Chancery] Rule 23.1 upon an independent board that has come

into existence after the time of the 'challenged transaction' would be excused if the board that approved the challenged transaction did not qualify for business judgment protection.

*Id.* at 230.

The court, however, did not announce an absolute rule that demand futility should always be measured at the time the complaint is filed. Rather, the court held that, where a derivative suit was properly initiated, the plaintiff need not make a new demand upon the board in the event the plaintiff seeks to amend the complaint to add new claims that relate to those already in litigation, even if there has been a change in the board's composition. *Id.* at 231.[23]

Blasband had not initiated his suit by the time of the change of ownership. While the challenged transaction raises a reasonable doubt as to the pre-merger Easco board's exercise of business judgment, the "transaction" prong of *Aronson's* test for demand futility would be irrelevant in assessing the Easco's board's ability to pur-

**21.** *See also* R. Franklin Balotti, Anne C. Foster & Frederick L. Cottrell, III, *Defense of Derivative Claims, in* 2 Securities Litigation 77, 93 (Practicing Law Institute 1990) ("As a theoretical matter there is little justification in requiring the court to examine the prior board or its action because even if the action challenged was not the product of a valid exercise of business judgment, the current board might well determine that the corporation's interests would be best served by not pursuing the cause of action.").

**22.** This is why Blasband is incorrect in stating that the district court has established a "departure from established law" in looking to the time of the filing of the complaint. While it is true that Delaware cases suggest that the second *Aronson* prong is determined at the time of the transaction, this is so, as observed by the *Harris* court, because typically the composition of the board is the same at the time the complaint is filed and thus the question never arises as to the propriety of making a demand at that point in time where the plaintiff is unable to satisfy the first prong of *Aronson.*

**23.** The court reasoned that a board that is comprised of new directors who are under no conflict with respect to a pending derivative claim may cause the corporation to: (1) move the court to take control of the litigation by being

re-aligned as a party plaintiff; (2) move to dismiss the case as not in the corporation's best interest; or (3) allow the representative plaintiff to carry the litigation forward. 582 A.2d at 230–31. Thus, "[t]hese options fully protect the legitimate rights of the board under Section 141(a) to manage the corporation's business and affairs." *Id.* at 231. The *Harris* court essentially struck a balance between the corporation's right and obligation to manage its own affairs and the equitable nature of the derivative suit. The court recognized that, while the demand requirement ensures that shareholders do not improperly encroach upon corporate powers,

> that rule and the policy behind it ought not to be so construed as to stall the derivative suit mechanism where it has been properly initiated. When claims have been properly laid before the court and are in litigation, neither [Delaware Court of Chancery] Rule 23.1 nor the policy it implements requires that a court decline to permit further litigation of those claims upon the replacement of the interested board with a disinterested one. In that circumstance a new board should be required to take one of the [three] steps outlined above, should it decide to act at all with respect to the matter. As in *Zapata Corporation v. Maldonado,* 'some tribute must be paid to the fact that the lawsuit was properly initiated.' 430 A.2d at 787.

*Id.*

sue the derivative claim directly after the merger if there was a change in control of the board. This factual issue is open as the parties have not indicated whether control of the Easco board changed following the merger. But if Blasband can show upon remand that a controlling group of Easco board members existing at the time of the challenged transactions continued to control the board at the time he filed his complaint, then he would be able to establish demand futility as to the Easco board under *Aronson*'s second prong. Otherwise he will not satisfy that prong.

### C.

### Dismissal With Prejudice

The district court's decision to deny Blasband leave to amend his complaint was predicated on an erroneous determination of law, namely, that he lacked standing to pursue this action. Rule 15(a) provides that "leave [to amend] shall be freely granted when justice so requires." Our case law manifests a strong preference that plaintiffs be given leave to amend where amendment is likely to cure the defects resulting in dismissal. *See Lewis v. Curtis*, 671 F.2d at 788. Because we have concluded that Blasband has standing to maintain this derivative action and believe he may be able to allege additional facts establishing demand futility, we find that he should be permitted to file a motion to seek leave to amend his complaint if he believes that he can in good faith satisfy the principles we have set forth.

### D.

### Summary on Demand

In summary, upon remand Blasband may seek leave to amend his complaint to allege facts demonstrating that demand was futile as to both the Easco and Danaher boards at the time the complaint was filed under the first *Aronson* prong. Inasmuch as Blasband has not pleaded particularized facts implicating either board's disinterest or independence in an amended complaint he must demonstrate that the boards were interested or lacked independence at the time the complaint was filed, in accordance with the above principles.

*Aronson*'s second prong may be useful to assess the futility of requiring demand upon the Easco, but not the Danaher, board. Moreover, if there was a change of control of the Easco board, we believe that the Delaware Supreme Court would follow the reasoning of the chancellor in *Harris*, and require that the adequacy of demand in this case be measured at the time of the complaint rather than at the time of transaction. Thus, in this instance the second *Aronson*, or "transaction" prong, would be inapplicable to Easco. But inasmuch as Blasband has established that the challenged transactions raise a reasonable doubt as to the pre-merger Easco board's exercise of business judgment, if Blasband shows that a controlling group of Easco board members that sat on that board at the time of the challenged transactions continued to control the board at the time he filed his complaint, he will have adequately demonstrated demand futility as to Easco.

### V.

### CONCLUSION

While we agree with the district court that Blasband did not adequately plead that demand was excused, inasmuch as we disagree with its conclusion that Blasband did not have standing to pursue a derivative claim on Danaher's behalf, we will vacate the order of August 15, 1991, and will remand the matter to the district court with leave to Blasband to move to amend his complaint to allege demand futility and to add Easco as a party to this action. Of course, we are not directing how the district court should rule on the motion as it is for that court to determine whether Blasband adequately pleads that demand was excused in a proposed amended complaint. *See Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir.1984), *cert. denied*, 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985). Obviously, if Blasband does not seek leave to amend his complaint or if his proposed

pleading is inadequate the case should again be dismissed.