# United States Court of Appeals for the Federal Circuit

---

**MONSANTO COMPANY** AND
**MONSANTO TECHNOLOGY, LLC,**
*Plaintiffs-Appellees,*

**v.**

**E.I. DU PONT DE NEMOURS AND COMPANY** AND
**PIONEER HI-BRED INTERNATIONAL, INC.,**
*Defendants-Appellants.*

---

2013-1349

---

Appeal from the United States District Court for the Eastern District of Missouri in No. 09-CV-0686, Senior Judge E. Richard Webber.

---

Decided: May 9, 2014

---

SETH P. WAXMAN, Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were PAUL R.Q. WOLFSON, THOMAS G. SAUNDERS, CAROLYN JACOBS CHACHKIN, and DANIEL AGUILAR. Of counsel on the brief were GEORGE C. LOMBARDI, and JAMES MATTHEW HILMERT, Winston & Strawn LLP, of Chicago, Illinois; JOHN JUSTIN ROSENTHAL, of Washington, DC; and JOSEPH P. CONRAN, Husch Blackwell, LLP, of St. Louis, Missouri.

THOMAS G. HUNGAR, Gibson, Dunn & Crutcher LLP, of Washington, DC, argued for defendants-appellants. With him on the brief was SCOTT P. MARTIN. Of counsel on the brief were JAMES P. DENVIR III and AMY J. MAUSER, Boies, Schiller & Flexner LLP, of Washington, DC.

————————————

Before LOURIE, REYNA, and WALLACH, *Circuit Judges.*

LOURIE, *Circuit Judge.*

E.I. Du Pont de Nemours and Company and its subsidiary Pioneer Hi-Bred International, Inc. (collectively "DuPont") appeal from the orders of the United States District Court for the Eastern District of Missouri imposing sanctions on DuPont by striking DuPont's contract reformation defense and counterclaims and awarding Monsanto Company and Monsanto Technology, LLC (collectively "Monsanto") attorney fees. *See Monsanto Co. v. E.I. Du Pont de Nemours & Co.*, No. 4:09-CV-0686, ECF No. 974 (E.D. Mo. Dec. 21, 2011) (sealed sanctions order); ECF No. 1043 (E.D. Mo. Feb. 16, 2012) (order approving itemized attorney fees); ECF No. 1662 (E.D. Mo. Nov. 16, 2012) (unsealed and redacted version of sanctions order). Because the district court did not abuse its discretion in imposing the sanctions, we *affirm*.

## BACKGROUND

Monsanto developed a genetic modification in soybean seeds, marketed under the Roundup Ready® ("RR") brand name and known as the 40-3-2 event (the "RR trait"), which enables soybean plants to tolerate the application of glyphosate herbicide that kills weeds. *See Monsanto*, ECF No. 124, slip op. at 1 (E.D. Mo. Jan. 15, 2010) (partial judgment on the pleadings). Monsanto owns U.S. Patent RE 39,247E (the "'247 Patent"), which covers the RR trait. In 1992, Monsanto granted Pioneer Hi-Bred International, Inc. ("Pioneer") a nonexclusive license to

produce and sell soybean seeds containing Monsanto's glyphosate-tolerant traits. After Pioneer became a subsidiary of DuPont, Monsanto and Pioneer entered into an Amended and Restated Roundup Ready® Soybean License Agreement on April 1, 2002 (the "License"), which superseded the 1992 license. J.A. 656. Under the License, DuPont produced and sold soybean seeds that were glyphosate-tolerant due to the RR trait. *Monsanto*, ECF No. 124, slip op. at 2.

In 2006, DuPont announced that it had developed its own glyphosate-tolerant trait, Optimum GAT® ("OGAT"), which was expected to confer tolerance to both glyphosate and acetolactate synthase inhibitor herbicide. J.A. 33991. DuPont intended to commercialize the OGAT trait, but subsequent testing indicated that OGAT alone did not provide sufficient glyphosate-tolerance for commercial use. J.A. 34004. DuPont therefore stacked, or combined, its OGAT trait with Monsanto's RR trait and discovered that the OGAT/RR stack provided increased yields in field trials. Appellant Br. 15; J.A. 14281. DuPont did not sell any OGAT/RR soybean product, however, and discontinued its development in 2011 or 2012. Reply Br. 29.

In May 2009, Monsanto sued DuPont for breach of the License and infringement of the '247 Patent. Monsanto maintained that the License did not allow DuPont to stack the RR trait with another glyphosate-tolerant trait, such as OGAT, or to commercialize the stacked product. *Monsanto*, ECF No. 124, slip op. at 2. DuPont answered and counterclaimed that the License permitted it to stack OGAT with RR and that if the License were interpreted to restrict or preclude the OGAT/RR stack, then the License should be reformed. *Id*.; *Monsanto*, ECF No. 21, at 81–82 (E.D. Mo. June 16, 2009) (answer and counterclaims). DuPont also asserted antitrust counterclaims. *Id*.

The License provides in section 3.01 that:

(a)  Subject to the terms of this Agreement, Monsanto hereby grants to Licensee, and Licensee, hereby accepts, a non-exclusive license within *the Licensed Field* . . . to develop, use, produce, have produced, offer to sell, sell and import Licensed Commercial Seed . . . .

(e)  The parties agree that except for applicable patents, Licensee shall be free to *introduce any gene and/or trait into, and commercialize as set forth in subparagraph 3.01(a)*, Licensed Commercial Seed . . . without the prior consent of Monsanto, except as specifically provided in subparagraph 3.01(g) and 3.01(h). . . .

(g)  Licensee shall not be entitled to . . . (iv) use Biological Materials outside *the Licensed Field.* . . .

(i)  Licensee agrees not to commercialize a variety of Licensed Commercial Seed which carries a gene or genes not supplied by Monsanto and which results in increased tolerance to a *nonglyphosate* herbicide without the prior written consent of Monsanto which consent shall not be withheld if Licensee reasonably demonstrates . . . that the introduction of such *nonglyphosate herbicide tolerance gene(s)* does not increase the injury . . . from glyphosate application to the crop . . . .

J.A. 660–61 (emphases added). The term "Licensed Field" is defined in section 2.09 as: "Licensed Commercial Seed which exhibit genetically-engineered protection against Glyphosate herbicide *solely* due to the presence of the Glyphosate-Tolerant Soybean Event: 40-3-2." *Id.* at 658 (emphasis added).

The district court granted partial judgment on the pleadings to Monsanto in January 2010, holding that the License was "unambiguous and [did] not grant [DuPont] the right to stack non-RR glyphosate-tolerant trait technologies with the licensed" trait. *Monsanto*, ECF No. 124, slip op. at 10, 23. The court reasoned that the primary license grant provision, section 3.01(a), was limited to a license "to produce and sell Licensed Commercial Seed 'within the Licensed Field.'" *Id.* at 7. In view of the Licensed Field definition in section 2.09, the court concluded that "Licensed Commercial Seed may only exhibit glyphosate resistance that is *solely due* to 40-3-2," and thus that the OGAT/RR stack was outside the Licensed Field because it generated glyphosate resistance that was not solely due to 40-3-2. *Id.* at 7–8 (emphasis in original). The court therefore dismissed DuPont's contract-based counterclaim. *Id.* at 24.

On January 29, 2010, DuPont moved for reconsideration and sought to restore its counterclaim to reform the License. *Monsanto*, ECF No. 150 (E.D. Mo. Jan. 29, 2010) (motion for reconsideration). DuPont also moved for leave to file a second amended answer and counterclaims ("SAAC") to add three contract reformation counterclaims. *Monsanto*, ECF No. 164 (E.D. Mo. Feb. 19, 2010) (motion for leave to amend). DuPont contended that the amendments were the product of "additional investigations" into the factual basis for reformation. *Id.* at 11–12.

The district court declined to reconsider its ruling that the License did not grant DuPont "a right to create OGAT/RR stacked seed products." *Monsanto*, ECF No. 283, slip op. at 8 (E.D. Mo. July 30, 2010) (order on motions for reconsideration and for leave to amend). While noting that "it [would] be difficult for Defendants to prove their reformation claims, especially given the clear and convincing evidence standard," *id.* at 14, the court nonetheless granted DuPont leave to file the SAAC to assert reformation counterclaims and defenses, *id.* at 15.

In the SAAC, DuPont acknowledged that it intended to commercialize the OGAT/RR stack and asserted that the License should be reformed to reflect the parties' understanding that it would not restrict DuPont from developing the OGAT/RR stack. *Monsanto*, ECF No. 316, at 30–31, 108, 110–11 (E.D. Mo. Aug. 19, 2010). DuPont based the amended reformation counterclaims on three alternative grounds: (1) mutual mistake, (2) DuPont's unilateral mistake and Monsanto's knowing silence, and (3) Monsanto's fraud. *Id.* at 167–72.

To support those counterclaims, DuPont asserted that "[a]t all times during the drafting and execution of the [License], Pioneer and DuPont thought that [the License] did not prohibit Pioneer from stacking other traits or genes, including traits or genes for glyphosate tolerance . . . ." *Id.* at 167–69. DuPont also asserted that "Pioneer and DuPont and Monsanto's agents all understood that the Licensed Field term, including the language 'solely due to the presence of' . . . has nothing to do with stacking restrictions," and that "Pioneer and DuPont did not at any time understand the Licensed Field term to restrict Pioneer from stacking traits or genes that provide similar protection as the licensed trait." *Id.* at 121.

During discovery, both parties filed motions that required the district court's frequent intervention. Concerning DuPont's reformation counterclaims, Monsanto moved to compel production of documents relating to DuPont's understanding of stacking restrictions under the License. *Monsanto*, ECF No. 639 (E.D. Mo. Mar. 4, 2011). The district court ruled that, by asserting reformation claims based on mutual mistake and unilateral mistake, DuPont had placed its subjective belief concerning its stacking rights at issue, "the truthful resolution of which require[ed] an examination of attorney-client communications." *Monsanto*, ECF No. 756, slip op. at 3 (E.D. Mo. May 17, 2011). The court consequently gave DuPont the option to "either voluntarily dismiss these reformation

claims or produce to Monsanto all documents bearing on these issues that it previously withheld." *Id.* at 4.

DuPont chose to continue litigating its reformation counterclaims and produced previously withheld internal e-mails of its in-house attorneys and high-level executives who were directly involved in negotiating the License. Those e-mails showed, for example, that DuPont's negotiators were aware in March 2002 that the "solely" language in section 2.09 could be a stacking restriction. *See, e.g.*, J.A. 14797 ("[S]ection 2.09 may be a problem . . . if we use a Glyphosate resistance gene (i.e. GAT) as a selectable marker in soybean transformation."). Moreover, when DuPont developed the OGAT/RR stack in 2007 and early 2008, those in-house attorneys advised that DuPont did not have the right to commercialize the OGAT/RR stack "[b]ecause of the field of use limitation in section 3.01(a)." *See, e.g.*, J.A. 14291, 14799.

Monsanto then moved for sanctions, seeking to invoke the district court's inherent powers and asserting that DuPont had misrepresented its subjective belief concerning stacking rights and had perpetrated a fraud on the court. *Monsanto*, ECF No. 864 (E.D. Mo. Sept. 6, 2011). DuPont maintained in opposition that it had always understood that the License authorized it to make and sell the OGAT/RR stack. *Monsanto*, ECF No. 893, at 9–10, 13, 21 (E.D. Mo. Sept. 21, 2011) (DuPont's opposition brief); *Monsanto*, ECF No. 961, at 43:3–5 (E.D. Mo. Nov. 30, 2011) (motion hearing transcript).

After a hearing, the district court granted the motion and imposed sanctions pursuant to its inherent powers on December 21, 2011. *Monsanto*, ECF No. 974 (sealed sanctions order); ECF No. 1662 (unsealed and redacted version). The court noted that, since the beginning of the litigation, DuPont had taken the position that "they contracted for, and have always believed that the [License] provided them with, the right to stack and com-

mercialize" the RR trait with the OGAT trait in soybeans, which provided the basis for DuPont's reformation claims. *Monsanto*, ECF No. 1662, slip op. at 2. The court found, however, that DuPont's position was not "rooted in fact" and that DuPont had made misrepresentations, which called into question its candor to the court. *Id.*

Specifically, Monsanto argued that DuPont had made five types of misrepresentations in its pleadings and motions: (1) that it "always had the right to commercialize (or sell) RR/OGAT stacked seeds;" (2) that it "always had the right to stack RR and OGAT traits;" (3) that it "believe[d] that Section 2.09 of the license agreements, the 'Licensed Field' definition, ha[d] no relation to stacking;" (4) that it "did not discover the meaning of the 'Licensed Field' definition and its limitation on stacking until 2008;" and (5) that it "believe[d] that Section 3.01(a) [did] not contain any type of field of use limitation." *Id.* at 4. After reviewing the record and considering arguments from both parties, the court found that DuPont had made factual misrepresentations concerning its subjective belief under each of the five categories as shown by its internal documents in order to support its reformation claims. *Id.* at 8, 15, 18–20. The court thus held that DuPont had perpetrated a fraud on the court and abused the judicial process, which warranted sanctions. *Id.*

As sanctions, the district court struck DuPont's reformation defense and counterclaims. *Id.* at 32. Moreover, after finding that DuPont had acted in bad faith, the court awarded attorney fees to Monsanto, but limited the award to fees incurred in defending against DuPont's reformation counterclaims beginning on January 29, 2010, the date on which DuPont moved to restore those claims, as well as fees incurred for the sanctions motions. *Id.* at 34; *Monsanto*, ECF No. 1043.

The parties then litigated the remaining claims. In June 2012, the district court granted summary judgment

in Monsanto's favor on its breach of contract claims and rejected DuPont's license defense, but held that the only contractual damages available to Monsanto were nominal damages. *Monsanto*, ECF Nos. 1308, 1309, 1310 (E.D. Mo. June 6, 2012). The patent infringement claims proceeded to trial and the jury returned a verdict for Monsanto, awarding a royalty as damages for the patent infringement. *Monsanto*, ECF No. 1563 (E.D. Mo. Aug. 1, 2012). A separate trial on DuPont's antitrust counterclaims was scheduled for October 2013. *Monsanto*, ECF No. 1618 (E.D. Mo. Oct. 2, 2012). In March 2013, Monsanto and DuPont stipulated to dismiss all claims and counterclaims with prejudice and jointly moved for final judgment. *Monsanto*, ECF No. 1687 (E.D. Mo. Mar. 26, 2013). DuPont reserved its right to appeal from the sanctions orders and rulings embodied therein, but not from other orders or rulings of the court. *Monsanto*, ECF No. 1688 (E.D. Mo. Mar. 26, 2013). The district court entered final judgment accordingly. *Monsanto*, ECF No. 1691 (E.D. Mo. Mar. 26, 2013).

DuPont timely appealed and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1). *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1346 (Fed. Cir. 1999) (holding that dismissal of patent claims with prejudice did not divest our jurisdiction to review a district court's decision regarding nonpatent claims).

## DISCUSSION

### I.

In appeals in patent cases, we apply the law of the regional circuit "to which district court appeals normally lie, unless the issue pertains to or is unique to patent law." *Molins PLC v. Quigg*, 837 F.2d 1064, 1066 (Fed. Cir. 1988). When reviewing the imposition of sanctions under a district court's inherent powers, we apply the law of the regional circuit in which the district court sits, here the

Eighth Circuit. *Baldwin Hardware Corp. v. FrankSu Enter. Corp.*, 78 F.3d 550, 560–562 (Fed. Cir. 1996).

The Eighth Circuit reviews a district court's imposition of sanctions under its inherent powers for an abuse of discretion. *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991)); *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993). Applying Eighth Circuit law, we give "substantial deference to the district court's determination as to whether sanctions are warranted because of its familiarity with the case and counsel involved." *Willhite v. Collins*, 459 F.3d 866, 869 (8th Cir. 2006). Moreover, "whether the extent of a sanction is appropriate is a question peculiarly committed to the district court." *Dillon*, 986 F.2d at 268. "[T]he issue is not what we might have done if the situation had been presented to us originally, but rather, whether the district court abused its discretion in imposing the sanction." *Id.* at 267. "'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 802 (8th Cir. 2005) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). Factual findings are not clearly erroneous unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer,* 470 U.S. 564, 573 (1985).

## II.

DuPont contends that interpreting the objective meaning of the License was a question of law and that the district court improperly sanctioned DuPont for making reasonable legal arguments that section 3.01 of the License permitted stacking and commercialization of glyphosate-tolerant traits. DuPont also contends that the district court erred in improperly relying on selected

documents to find that DuPont misrepresented its subjective belief concerning stacking restrictions, whereas the full record reflected a contested factual issue.  Moreover, DuPont contends that the views of its individual employees should not be attributed to the company.  DuPont also contends that the statements made by its employees in 2007 and 2008 were irrelevant to the reformation of the 2002 agreement and that those statements were merely conservative legal advice of in-house counsel.  DuPont asserts that the sanctions were improper because the court's ability to function impartially was not adversely affected and that the sanctions would hinder zealous advocacy.  DuPont also asserts that its conduct did not meet the high standard for a finding of fraud on the court.

Monsanto responds that the district court did not sanction DuPont for making legal arguments concerning the objective meaning of the License, but, rather, the court imposed narrowly-tailored sanctions on DuPont for factual misrepresentations of its subjective belief concerning stacking rights supporting its reformation claims. Monsanto contends that those representations were directly contradicted by DuPont's later-produced internal documents and that the court properly relied on documents that were authored by DuPont's in-house attorneys and top executives who negotiated the License.  Moreover, Monsanto argues that the court properly considered documents from 2007 and 2008, because they shed additional light on DuPont's prior understanding of the 2002 agreement and whether DuPont continued to maintain that understanding.  Monsanto also responds that DuPont's repeated misrepresentations and their effect on the litigation supported the court's finding that DuPont acted in bad faith, which warranted the attorney fees sanction.

We agree with Monsanto that the district court did not abuse its discretion in imposing narrowly-tailored sanctions on DuPont for making factual misrepresenta-

tions concerning its subjective understanding of the License in order to advance its reformation counterclaims. "[A] district court possesses inherent powers 'to manage [its] affairs so as to achieve the orderly and expeditious disposition of cases.'" *Wescott Agri-Prods., Inc. v. Sterling State Bank, Inc.*, 682 F.3d 1091, 1095 (8th Cir. 2012) (quoting *Chambers*, 501 U.S. at 43). "A court must exercise its inherent powers with restraint and discretion, and a primary aspect of that discretion is the ability to fashion an appropriate sanction." *Harlan v. Lewis,* 982 F.2d 1255, 1262 (8th Cir. 1993).

The record is clear that the district court did not sanction DuPont for making legal arguments concerning the objective meanings of the License. Almost two years before imposing the sanctions, the court interpreted the License as a matter of law in the partial judgment on the pleadings, in which it concluded that the License did not grant DuPont the right to stack OGAT with the RR trait. *Monsanto*, ECF No. 124. DuPont then moved for reconsideration of that interpretation and, alternatively, sought to reform the License so that it could avoid infringement liability for developing the OGAT/RR stack. *Monsanto*, ECF Nos. 150, 316. The district court declined to reconsider its interpretation of the License, but granted DuPont leave to file the SAAC to pursue its reformation counterclaims. *Monsanto*, ECF No. 283. Thus, the objective meaning of the License had been decided at an early stage of the litigation and DuPont's allegations were made in an attempt to obtain reformation of the License in view of the district court's interpretation.[*]

---

[*]  Because DuPont had stipulated to only appeal from the sanctions orders, and not from other rulings of the district court including the partial judgment on the pleadings, we need not consider whether the district court correctly interpreted the License as a matter of law.

In the sanctions order, the district court made clear that DuPont was sanctioned for knowingly making *factual* misrepresentations concerning its subjective belief in order to maintain its reformation claims. *Monsanto*, ECF No. 1662, slip op. at 2, 4, 8, 15, 18–20. The court reviewed DuPont's statements in the SAAC and subsequent motions concerning reformation and found that DuPont had misrepresented its subjective belief, an element of reformation that was to be decided as a matter of fact. *Id.* at 8–9, 15–16, 18–19. As sanctions, the court specifically and exclusively targeted the reformation claims, which depended on DuPont's factual misrepresentations, by striking those claims and awarding related attorney fees. *Id.* at 32–34.

Even though the court also cited statements from DuPont's motion opposing the partial judgment on the pleadings regarding the *objective* meaning of the License, the court referred to those statements only to infer DuPont's litigation position on its *subjective* belief concerning the License. *Id.* at 5–6, 8, 20 (finding that DuPont maintained in the litigation that "they believed they had the right to sell RR/OGAT stacked seeds"). By asserting the reformation counterclaims after the partial judgment on the pleadings, DuPont maintained its prior position that the 2002 agreement allowed it to stack and commercialize an OGAT/RR product, although at that later stage it based its claims on its purported subjective belief in that position. Even assuming that DuPont's arguments concerning the objective meaning of the License were not sanctionable when first made, its subsequent insistence in attempting to reform the License to reflect its interpretation of the agreement rendered those earlier statements relevant to factual issues underlying the reformation claims.

Under Delaware law, which governs the License, a contract may be reformed in rare instances to express the "real agreement" of the parties. *Cerberus Int'l, Ltd. v.*

*Apollo Mgmt. L.P.*, 794 A.2d 1141, 1151 (Del. 2002). Delaware law recognizes three grounds for reformation: (1) mutual mistake, (2) unilateral mistake coupled with knowing silence of the other party, and (3) fraud by the other party. *See id.* (mutual mistake and unilateral mistake); *Emmert v. Prade*, 711 A.2d 1217, 1219 (Del. Ch. 1997) (fraud). Because a duly executed formal instrument may not be lightly set aside, a party seeking to reform a contract must prove by clear and convincing evidence that, before executing the written instrument, the parties came to a specific prior understanding that differed materially from the written agreement, and that it mistakenly believed that the final, executed contract accurately expressed that prior understanding. *Cerberus*, 794 A.2d at 1150–52, 1155; *Hob Tea Room, Inc. v. Miller*, 89 A.2d 851, 856–57 (Del. 1952). Thus, by asserting reformation counterclaims based on all three possible grounds, DuPont's subjective belief concerning the License became a material factual issue.

Here, the district court did not clearly err in finding that DuPont had made material factual misrepresentations of its subjective belief. DuPont's later-produced internal documents contradict its litigation statements concerning its subjective belief. For example, DuPont maintained in the SAAC that it "did not at any time understand the Licensed Field term [in section 2.09] to restrict" stacking of glyphosate-tolerant traits. *Monsanto*, ECF No. 316, at 121. However, in a March 26, 2002 e-mail, a DuPont negotiator noted that "section 2.09 may be a problem . . . if we use a Glyphosate resistance gene (i.e. GAT) as a selectable marker in soybean transformation." J.A. 14797. The district court thus found that DuPont was aware of possible stacking restrictions in section 2.09, but it did not change the language of that section or suggest any language on the topic of stacking glyphosate-tolerant traits prior to executing the License. *Monsanto*, ECF No. 1662, slip op. at 10–11, 18. Thus, we discern no

clear error in the district court's findings that DuPont had made factual misrepresentations of its subjective understanding.

We also find no error in the district court's reliance on the statements of DuPont's individual employees to infer DuPont's subjective belief concerning the License. Those employees were high-level executives and in-house attorneys, who directly participated in the negotiation with Monsanto as DuPont's corporate representatives. In addition, because DuPont had waived its attorney-client privilege to pursue the reformation counterclaims, the court properly considered the statements of DuPont's in-house attorneys who were part of the negotiation team.

In addition, we find no error in the district court's discretionary consideration of subsequent statements made by those negotiators in the 2007 and 2008 documents, which are relevant at least as circumstantial evidence of DuPont's prior understanding of the 2002 agreement and whether DuPont "always" had that understanding as it had pled. DuPont's negotiators stated in 2007 that DuPont did not have the right to commercialize the OGAT/RR stack because of the field of use limitation in section 3.01(a). J.A. 14799. The district court observed that those negotiators expressed "no surprise at an expected claim by Monsanto that the [License contained] stacking restrictions." *Monsanto*, ECF No. 1662, slip op. at 28. Moreover, DuPont asserted to the district court that it had always believed that the License granted it certain rights, and thus the 2007 and 2008 documents were relevant to the basis of that assertion. *Monsanto*, ECF No. 893, at 1, 9–10, 21; ECF No. 961, at 43:3–5. As such, the court did not err in considering the 2007 and 2008 documents.

DuPont argues, however, that the record as a whole showed a disputed factual issue concerning its subjective belief and thus did not warrant sanctions for misrepre-

sentation.  DuPont specifically referred to internal e-mails between its negotiators in March 2002.  J.A. 14440, 14969–70, 14301–02.  However, we find that those e-mails do not support DuPont's broad assertion to the district court that it had negotiated for and obtained the right to make and sell an OGAT/RR product.

In a March 27, 2002 e-mail, a DuPont negotiator informed his colleague that the parties were "[s]till having major problems with the RR/[ ] stack on beans as a commercial product," but Monsanto had "OK'ed a gene that confers [glyphosate] resistance as a *marke*[*r*] (i.e. GAT)." J.A. 14440 (emphasis added).  That negotiator, however, cautioned his colleague that "[b]efore you get too excited about GAT . . . [t]hey do not know about it specifically, and they will obviously have other issues (i.e. patents) regarding [its] use . . . [but] at least the agreement does not prohibit use of a non-Mon[santo] gene which supplies gly[phosate]-tolerance."  J.A. 14440.  In a March 28 e-mail, the negotiator explained to his colleague that by introducing section 3.01(i), which addressed the stacking and commercialization of non-glyphosate-tolerant gene(s) with the RR trait, DuPont "would not be blocked against using another glyphosate resistance gene as a *selectable marker*, . . . but . . . it does not necessarily mean we have an FTO on another Gly[phosate]-tolerant gene," where FTO referred to freedom-to-operate.  J.A. 14969 (emphasis added).

Upon review of the entire record, we find no clear error in the district court's finding of misrepresentation. The March 27 and 28 e-mails are consistent with the court's finding that DuPont was aware that Monsanto sought to impose stacking restrictions during the license negotiation, but that DuPont did not propose contract language to specifically address its right to stack and commercialize an OGAT/RR product.  At best, those e-mails showed that DuPont anticipated using OGAT as a *selectable marker*, a research tool or marker for detecting

the successful transformation of another gene into the RR soybeans. Those e-mails, however, contained no discussion concerning whether DuPont negotiated for the right to *make and sell* an OGAT/RR commercial product. Notably, DuPont made no argument at the district court that the License should be reformed based on DuPont's purported belief that it was not prohibited from using OGAT as a selectable marker. Instead, DuPont sought in the district court to reform the License in order to obtain the express right to make and sell an OGAT/RR product, when its internal documents directly contradicted its broad assertion of that right. *See, e.g.*, J.A. 14799 ("[DuPont] can stack but no commercial rights."); J.A. 14318 ("A conservative reading says we can stack but may not be able to commercialize, a potentially useless right.").

We therefore conclude that the district court did not clearly err in finding that DuPont had misrepresented its subjective belief concerning the License in order to maintain its reformation claims. We further conclude that the district court did not abuse its discretion in imposing its narrowly-tailored sanctions.

A district court has the discretion "'to fashion an appropriate sanction for conduct which abuses the judicial process,' including assessing attorney fees or dismissing the case." *Wescott*, 682 F.3d at 1095 (quoting *Chambers*, 501 U.S. at 44–45). "When a litigant's conduct abuses the judicial process, dismissal of a lawsuit is a remedy within the inherent power of the court." *Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 694 (8th Cir. 2001) (citing *Pope v. Fed. Express Corp.*, 974 F.2d 982, 984 (8th Cir. 1992)). Under Eighth Circuit law, "a finding of bad faith is not always necessary to the court's exercise of its inherent power to impose sanctions." *Stevenson*, 354 F.3d at 745; *Harlan*, 982 F.2d at 1260 (noting that the bad faith requirement does not extend "to every possible disciplinary exercise of the court's inherent power"). However, "[a] bad faith finding is specifically required in order to

assess attorneys' fees." *Stevenson*, 354 F.3d at 751 (citing *Chambers*, 501 U.S. at 45–46). Thus, "if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Chambers*, 501 U.S. at 46 (internal citation and quotation marks omitted).

Here, the district court found that DuPont had abused the judicial process and acted in bad faith. The court found that DuPont repeatedly misrepresented its subjective belief in order to support its reformation counterclaims, which prolonged the "already-protracted proceedings and caused unnecessary expense to Monsanto and needless effort by the [c]ourt." *Monsanto*, ECF No. 1662, slip op. at 8, 15, 19, 20. The court found that DuPont delayed the litigation "by their insistence that they believed they had the right to stack and commercialize RR and OGAT." *Id.* at 33. The court reasoned that striking portions of the SAAC was "the only means" to deter DuPont's misconduct and to preclude DuPont from continuing its behavior, which the district court found to be "an abuse of judicial process." *Id.* at 32. The court also found that the repeated misrepresentations had "compromised the integrity of the case," that DuPont's refusal "to abandon these false statements . . . amount[ed] to vexatious conduct," and that DuPont had "acted in bad faith." *Id.* at 34.

We consider those findings of the district court not to be clearly erroneous, as the court had first-hand knowledge of how DuPont's conduct affected the progress of the litigation. For almost two years from January 2010 to December 2011, DuPont restored, amended, and litigated its reformation counterclaims. When seeking leave to file the SAAC, DuPont represented to the district court that the amended counterclaims were the product of its

"additional investigation" of the factual basis for reformation. *Monsanto*, ECF No. 164, at 11–12. DuPont's internal documents, however, contradicted its litigation statements concerning reformation. Those internal documents were initially withheld by DuPont under a claim of privilege and produced only after the court's ruling on Monsanto's motion to compel, in which the court gave DuPont the option of either dismissing the reformation claims or producing those internal documents. DuPont chose to continue litigating the reformation claims and seeking to invoke the court's equitable power to reform the License in order to obtain the right to make and sell an OGAT/RR product, despite contradictory evidence showing that DuPont's own negotiators questioned whether DuPont had obtained that right. We therefore conclude that the district court did not err in holding that DuPont had abused the judicial process and acted in bad faith.

Moreover, the district court properly exercised its discretion in imposing targeted sanctions by carefully fitting its sanctions to the conduct that it found to be improper. The court allowed DuPont to continue litigating other contract, patent infringement, and antitrust counterclaims and defenses. The court limited the attorney fees award to fees directly incurred on the reformation claims after January 29, 2010, the date on which DuPont moved to restore those claims. We therefore conclude that the court acted within its discretion.

Although, as indicated, we agree with the district court that DuPont's overly zealous advocacy to advance its reformation claims constituted bad faith and vexatious conduct, we do find that DuPont's conduct did not satisfy the high standard for "fraud on the court" as described in *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047, 1048 (8th Cir. 1991) and *Pfizer Inc. v. International Rectifier Corp.*, 538 F.2d 180, 195 (8th Cir. 1976). In those cases, fraud on the court was narrowly defined as "the most egregious mis-

conduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel." *Id.* Such conduct did not occur here.

However, other Eighth Circuit cases appear to apply a lower standard for sanctions under the court's inherent powers and do not require a finding of "fraud on the court." *See, e.g.*, *Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC*, 458 F.3d 733, 739 (8th Cir. 2006) (sanctions after a finding of bad faith); *Stevenson*, 354 F.3d at 751 (sanctions of attorney fees and adverse inference jury instruction for "bad faith conduct"); *see also Chambers*, 501 U.S. at 46 (sanctions of attorney fees when a party "shows bad faith by delaying or disrupting the litigation"). Under the latter test, DuPont exceeded the bounds of appropriate conduct and stretched its advocacy beyond what was reasonably justified. Because the district court correctly found that DuPont had abused the judicial process and acted in bad faith by making affirmative factual misrepresentations and because the court imposed narrowly-tailored sanctions, we affirm.

## CONCLUSION

Because we conclude that the district court did not abuse its discretion in imposing the sanctions on DuPont, we *affirm*.

## **AFFIRMED**