NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4006
_____

ROBERT ZOMOLOSKY, derivatively on behalf of
E.I. Du Pont De Nemours Company,

Appellant

v.

ELLEN KULLMAN; LOIS D. JULIBER; CURTIS J. CRAWFORD;
RICHARD H. BROWN; BERTRAND P. COLLOMB; ALEXANDER M. CUTLER;
WILLIAM K. REILLY; SAMUEL W. BODMAN; JOHN T. DILLION;
E.I. DUPONT DE NEMOURS AND COMPANY
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1-13-cv-00094)
District Judge: Honorable Sue L. Robinson
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 10, 2015
_____

Before: VANASKIE, SLOVITER, and RENDELL, *Circuit Judges*

(Filed: January 15, 2016)
_____

OPINION*
_____

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

VANASKIE, *Circuit Judge.*

Appellant Robert Zomolosky appeals from the District Court's Order dismissing his derivative action on behalf of E.I. Du Pont De Nemours Company ("DuPont") against Appellees, current and former members of DuPont's Board of Directors ("the Board"). He contends that the District Court incorrectly applied the test articulated in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993), which governs how demand futility is to be pled in a derivative action premised on board inaction. For the reasons discussed below, we will affirm.

I.

DuPont, a conglomerate comprised of thirteen different businesses, has a large stake in the development of bacteria- and insecticide-resistant crops, including corn and soybeans.[1] Monsanto Company ("Monsanto"), a producer of rival agricultural farm products, holds a patent on an herbicide known as "Roundup." To encourage farmers to use Roundup, Monsanto also developed a line of genetically modified "Roundup Ready" corn and soybean seeds that are resistant to the herbicide. Monsanto's patent on Roundup-Ready products expired in 2014.

In 1993, Monsanto and Pioneer Technologies Inc. ("Pioneer") entered into a licensing agreement to develop bacteria-resistant corn seeds. The parties abided by this

---

[1] These facts are drawn from Zomolosky's Second Verified Derivative Amended Complaint. We must accept as true the facts alleged, and draw all reasonable inferences in his favor. *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).

agreement until March 1997, when Pioneer sued Monsanto for allegedly violating the 1993 agreement ("the 1997 litigation"). Monsanto counterclaimed that Pioneer was stacking its own bacteria-resistant gene with Monsanto's Roundup-Ready genes in violation of the licensing agreement. On August 23, 2000, a jury returned a verdict in Monsanto's favor, resulting in an $11 million judgment against Pioneer.

In March 1999, while the 1997 litigation was still pending, DuPont acquired Pioneer. Monsanto claimed that this sale voided a separate licensing agreement with Pioneer for the use of Roundup Ready in corn seeds. DuPont disputed that contention, which led to three years of litigation ("the 1999 litigation"). The 1999 litigation terminated in 2002 when the parties entered into a licensing agreement that allowed DuPont to sell Roundup-Ready soybean and corn seeds, but did not permit DuPont to stack Roundup Ready with its own gene technology.

Starting in 2005, DuPont—through Pioneer—initiated development of an herbicide-resistant technology known as Optimum GAT ("OGAT") to compete with Roundup Ready. Over the next three years, DuPont invested $4 billion into the development of OGAT. By July 2007, however, DuPont's development team realized that the OGAT soybean seeds were not performing as expected. Shortly thereafter, DuPont's CEO, Charles Holliday, Jr., conceded to shareholders that OGAT was facing significant difficulties. He then offered an alternative plan: DuPont would explore stacking OGAT with Monsanto's Roundup-Ready technology.

In August 2008, Holliday called Monsanto CEO Hugh Grant to inquire about a licensing agreement that would allow DuPont to stack OGAT with Roundup Ready. Monsanto demanded approximately $1.5 billion in royalties, and in the end, no deal was consummated. Four months later, in late December 2008, Monsanto indicated in a Form 10-Q filing with the Securities and Exchange Commission ("SEC") that it had entered into a dispute resolution process with DuPont regarding Monsanto's allegations that DuPont was violating the terms of the 2002 licensing agreement by stacking Roundup-Ready genes with its own gene technology.

In May 2009, Monsanto sued DuPont for patent infringement in the Eastern District of Missouri ("the 2009 litigation"). In August 2009, Monsanto's Grant sent a letter to Holliday and DuPont's new CEO, Ellen Kullman, requesting that DuPont form an independent committee to investigate the alleged patent infringement. No committee was ever formed. While the 2009 litigation was pending, however, DuPont placed the development of OGAT "soy stacks with Roundup Ready 1 . . . on hold pending resolution of [the] dispute with Monsanto." App. 79.

In January 2010, the district court granted Monsanto's motion for partial summary judgment, concluding that DuPont had breached the 2002 licensing agreement. About two years later, in December 2011, the court sanctioned DuPont and its counsel for misrepresenting DuPont's understanding of the terms of the 2002 licensing agreement. The case then proceeded to a jury trial on the issues of willfulness and damages. In August 2012, the jury found that DuPont willfully violated Monsanto's patents and

4

awarded $1 billion in damages.  A subsequent settlement agreement, however, terminated the lawsuit.  This agreement required DuPont to pay Monsanto $1.75 billion over ten years in exchange for a license to stack OGAT with Roundup Ready.  The arrangement also gave Monsanto various rights to DuPont technologies developed using the Roundup-Ready genes.

In January 2013, Zomolosky filed a Verified Derivative Complaint in the District of Delaware on behalf of DuPont in which he alleged that the Board's lack of oversight and implicit approval of illegal activity led to the patent infringement underlying the 2009 litigation.  In March 2013, Zomolosky filed an amended complaint, and after Appellees moved to dismiss, he filed a second amended complaint.  In June 2013, Appellees filed a second motion to dismiss, which the District Court granted on September 12, 2014.  Zomolosky timely appealed.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1332.  We have appellate jurisdiction under 28 U.S.C. § 1291.  "We review a district court's ruling on demand futility under Fed. R. Civ. P. 23.1 for abuse of discretion."  *Kanter v. Barella*, 489 F.3d 170, 175 (3d Cir. 2007).  For purposes of this appeal, we apply Delaware law when reviewing the substantive requirements of a shareholder's derivative claim, including demand futility.  *Blasband v. Rales*, 971 F.2d 1034, 1047 (3d Cir. 1992).  We review *de novo* the District Court's construction and interpretation of Delaware law.  *See Nelson v. Cnty. of Allegheny*, 60 F.3d 1010, 1012 (3d Cir. 1995).

III.

The central issue in this appeal is whether Zomolosky should be excused from the normal requirement that he make a demand on the Board that it bring suit on behalf of the corporation before commencing a derivative action. Zomolosky argues the District Court erred by applying the standard for demand futility articulated in *Rales*, and by failing to draw reasonable inferences in his favor concerning the Board's knowledge of the ongoing pattern of infringement dating back to 1997.

A.

"A basic principle of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." *Spiegel v. Buntrock*, 571 A.2d 767, 772–73 (Del. 1990); *see* Del. Code Ann. tit. 8 § 141(a). This includes the decision to commence litigation or, alternatively, to abstain from filing suit. *Spiegel*, 571 A.2d at 773. We have explained that "it is clear that the demand requirement is not a mere formality, but rather is an important aspect of Delaware's substantive law." *Blasband*, 971 F.2d at 1048.

Delaware courts have developed two tests to evaluate whether a plaintiff has properly pleaded demand futility. The first, set out in *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), generally applies when a plaintiff seeks to challenge a specific action taken by a board—"*i.e.,* where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties," *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). Under

6

this analysis, a court must determine whether the complaint: (1) sufficiently rebuts the presumption of director disinterest and independence through well-pleaded facts, *Rales*, 634 A.2d at 936; or (2) pleads particularized facts creating "a reasonable doubt" that the challenged business decision was a product of validly exercised business judgment, *Aronson*, 473 A.2d at 814.

On the other hand, the second test applies when "the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties." *Wood*, 953 A.2d at 140. Under this test, the analysis focuses on the Board's inability to exercise its business judgment in evaluating the demand itself. *Id*. In those circumstances, "the appropriate inquiry is whether [the plaintiff's] amended complaint raises a reasonable doubt regarding the ability of a majority of the Board to exercise properly its business judgment in a decision on a demand had one been made at the time this action was filed." *Rales*, 634 A.2d at 937. This inquiry is commonly referred to as the *Rales* test.

Zomolosky contends that the District Court improperly applied the *Rales* test on these facts. He argues that Delaware courts have recently applied *Aronson* to situations where a board has consciously failed to take action, such as in *Quadrant Structured Products Company v. Vertin*, 102 A.3d 155 (Del. Ch. 2014). There, the Court of Chancery explained that "[a] conscious decision not to take action is just as much of a decision as a decision to act." *Id.* at 183. The board in *Vertin* was presented with a choice between two options: (1) take action and defer interest on junior notes, or (2) take

7

no action and allow the junior notes to collect interest. *Id.* The Court of Chancery concluded that the Board's inaction was the product of a conscious choice, undertaken with full knowledge of the consequences that would follow. *Id.*

In this case, however, the Board was not presented with an explicit choice of action or inaction, each of which carried known and attendant consequences. Rather, Zomolosky's complaint charges the Board with general inaction, lack of oversight, and acquiescence. *See* App. 43 ("DuPont's Board members knew of the latest infringement from an early date, and did nothing to halt it[.]"); *id.* 78 ("The Board took no steps to stop DuPont's improper actions."); *id.* 80 ("The DuPont Board's knowing acquiescence in DuPont's wrongful and recidivist course of unlawful conduct is an affirmative breach of fiduciary duty."); *id.* ("The Board Consciously Failed to Take Steps to Protect DuPont and to Bring Its Behavior Into Conformity With the Law"). Despite Zomolosky's attempts to cast his complaint in a different light, at its core, his claim is that the Board "violated a duty to be active monitors of corporate performance." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). Accordingly, we conclude that the District Court appropriately determined that the demand futility analysis was governed by *Rales*. *See In re INFOUSA, Inc. Shareholders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007) (*Rales* applies "[w]here the complaint does not address an action taken by the board").

B.

8

Having determined the appropriate substantive standard for pleading demand futility, we now turn to the District Court's application of *Rales*. A plaintiff can satisfy *Rales* by alleging facts showing that the directors face a "substantial likelihood" of personal liability. *Rales*, 634 A.2d at 986. Thus, Zomolosky's complaint needed to contain allegations "that the directors were conscious of the fact that they were not doing their jobs," *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003), and that they ignored "red flags that should have alerted the [Board] to the problems." *Kanter*, 489 F.3d at 181. The purported "red flags" must be of such a nature that we can infer "that the directors knew or . . . should have known," *In re Caremark*, 698 A.2d at 971, that DuPont was engaged in patent infringement. Furthermore, Federal Rule of Civil Procedure 23.1 requires Zomolosky to plead with particularity "the reason for . . . not making the effort" to demand that the Board bring the desired legal action itself. Fed. R. Civ. P. 23.1(b)(3).

Zomolosky argues that the facts pleaded with particularity in his complaint— coupled with the reasonable inferences drawn therefrom—demonstrate that the Board consciously ignored numerous "red flags" that were sufficient to put it on notice of the ongoing infringement on Monsanto's Roundup-Ready technology. Such indicators include: (1) the 1997 and 1999 patent-infringement lawsuits; (2) the Board's knowledge of the 2002 licensing agreement; (3) the major investment in OGAT; (4) Holliday's attempt to broker a licensing agreement with Monsanto; (5) Monsanto's SEC filing discussing the patent infringement; (6) Monsanto's December 2009 letter to Holliday and Kullman calling for an investigation into the patent infringement; (7) sanctions levied in

9

the course of the 1999 and 2009 litigation; and (8) the Board's decision to give Kullman a raise in 2013. Zomolosky also alleges that the Board had a duty—detailed in DuPont's proxy statements—to regularly review information concerning the legal risks associated with proposed and ongoing projects. He also claims that the Board's Science and Technology Committee was charged with monitoring the development of new technologies and associated legal risks.

Turning first to the prior legal actions, the 1997 litigation did not involve Roundup-Ready genes. Instead, Monsanto based its counterclaim on Pioneer's unauthorized stacking of bacteria-resistant gene technology. Similarly, although the 1999 litigation did allege that DuPont stacked Roundup-Ready, herbicide-resistant genes without authorization, the action stemmed from its use in corn seeds. In contrast, the 2009 litigation centered on DuPont's unlicensed stacking of Roundup-Ready genes in soybean seeds. As the District Court noted, these prior suits involved different subject matters and predated the 2009 litigation by over a decade. We agree that the 1997 and 1999 suits did not put the Board on notice of the alleged infringement at issue here.

Zomolosky also argues that the Board was aware of "the rights . . . incorporated in the 2002 Licensing Agreement," which was a result of the 1999 litigation. Appellant's Br. at 32. The complaint, however, simply alleges that members of DuPont's intellectual-property legal team were intimately involved in negotiating the 2002 Licensing Agreement. In turn, they reported to the Vice-President and Assistant General Counsel of DuPont, who then reported to DuPont's General Counsel, Tom Sager. Sager

10

answered directly to the Board and also directed the 2009 litigation. Except for the description of this chain of command, there is no averment that speaks with particularity to specific communications which would have given the Board knowledge of the rights incorporated in the 2002 licensing agreement.[2]

Next, the complaint claims that by early 2008, the Board should have known OGAT was failing—despite the $4 billion expended in developing the product line—and that later in 2008, Holliday was attempting to negotiate a licensing agreement with Monsanto to stack OGAT with Roundup Ready. These events, however, were not "red flags" tending to show that DuPont was infringing on Monsanto's Roundup Ready patent. They establish nothing more than that the Board knew Holliday was taking the reasonable step of negotiating a licensing agreement to remedy OGAT's shortcomings.

Monsanto's SEC filing and letter of August 17, 2009 are also insufficient to impute knowledge of infringement to the Board. As the District Court explained, the SEC filing—which may or may not have come to the Board's attention—"does not necessarily lead to the conclusion that DuPont" and, more specifically, its Board "knew it was infringing." App. 23. Similarly, Monsanto's letter was sent to Holliday and Kullman, not to the Board itself. Although we agree with Zomolosky that a court can

---

[2] Zomolosky maintains that the District Court should have taken judicial notice of an SEC filing that purportedly showed that the Board was aware of the requirements of the 2002 agreement. We review the District Court's decision regarding judicial notice for abuse of discretion. *See United States v. Mitchell*, 365 F.3d 215, 251 (3d Cir. 2004). As the District Court noted, Zomolosky was free to include these allegations in any of the three complaints filed in this matter, and he failed to do so. We discern no abuse of discretion.

11

draw a "reasonable inference . . . that those officers passed the information on to the directors," *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014), the letter merely recited the same allegations at issue in the then-pending patent lawsuit. We cannot infer that such information—coming from a major competitor and opposing party in an ongoing lawsuit—is sufficient to put the Board on notice that DuPont was willfully infringing on Monsanto's patents.

As to the court sanctions imposed during the 1999 and 2009 litigation, Zomolosky contends "the seriousness and harshness of both sanction orders, taken together in totality create an inference of a pattern of behavior and conduct about which the Board *should have been advised*." Appellant's Br. at 25 (emphasis added). It does not follow, however, that these specific orders would have notified the Board that DuPont was infringing the Roundup-Ready technology. In the 1999 litigation, the court sanctioned DuPont for "discovery misconduct." App. 52. It cannot be the case that this type of procedural sanction—levied in 2001—would put the Board on notice of specific instances of infringement occurring seven years later. Zomolosky's reliance on the 2009 litigation is equally unavailing. There, the court sanctioned DuPont for "knowingly making *factual misrepresentations* concerning its *subjective belief* in order to maintain its reformation claims." *Monsanto Co. v. E.I. Du Pont de Nemours & Co.*, 748 F.3d 1189, 1197 (Fed. Cir. 2014) (emphases added). We cannot conclude, however, that this sanction supports an inference that the Board was aware both of the explicit conditions contained in the 2002 licensing agreement and of the infringement at issue. Rather, this

12

sanction only speaks to DuPont's unsuccessful legal strategy, namely, claiming that the 2002 licensing agreement was subject to reformation to incorporate the stacking of Roundup Ready. *Id.*

Next, Zomolosky contends that the Board's Science and Technology Committee must have known that DuPont was stacking Roundup Ready in violation of the licensing agreement. As the District Court explained, reports from the Science and Technology committee and other management personnel "would have provided the board with updates on ongoing research and development. However, these allegations are not sufficient for the court to infer that the board members knew that such research was infringing and, therefore, were not discharging their duties or were consciously disregarding such duties." App. 23. We agree. In the absence of any allegation detailing what was specifically presented to the committee concerning the OGAT-Roundup-Ready stack prior to 2012, the complaint fails to plead knowledge with the requisite particularity. *See Kanter*, 489 F.3d at 181 (pleading must allege that committee's "work was patently inadequate or that [the committee itself] functioned with clear notice of serious . . . irregularities").

The only allegation remaining is Kullman's 2013 raise—awarded after the 2009 litigation had concluded. This action thus bears no relation to the patent infringement or the Board's knowledge of such activity.

IV.

13

For the forgoing reasons, we will affirm the District Court's judgment of September 12, 2014.